AYUDA, INC., et al.

v.

Richard THORNBURGH, et
al., Appellants.

No. 88–5226.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 7, 1989.
Decided July 18, 1989.

Donald E. Keener, Atty., Dept. of Justice, Washington, D.C., with whom David J. Kline, Asst. Director, Office of Immigration Litigation, Dept. of Justice, Alexandria, Va., and John R. Bolton, Asst. Atty. Gen., Civ. Div., Dept. of Justice, Washington, D.C., were on the brief, for appellants.

Wayne H. Matelski, with whom Lynda S. Zengerle, Carolyn Waller, Michael Rubin, David Aronofsky and Deborah Sanders, Washington, D.C., were on the brief, for appellees.

Before WALD, Chief Judge, SILBERMAN and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting opinion filed by Chief Judge WALD.

SILBERMAN, Circuit Judge:

This is an appeal from a declaratory order and injunction issued by the district court concerning implementation of the legalization or "amnesty" provisions of the Immigration Reform and Control Act of 1986 ("IRCA"). We hold the district court lacked jurisdiction and therefore vacate the order.

## I.

IRCA, passed in 1986, imposed civil and criminal penalties upon employers who hire illegal aliens. Congress, through that approach, sought to discourage illegal immigration into the United States and to make it difficult for undocumented aliens to remain in the country. As part of a legislative compromise, the Act provided for the legalization of those immigrants who had entered the United States unlawfully prior to January 1, 1982, and had resided continuously in the country in an unlawful status since then. It was said that "past failures to enforce[ ] the immigration laws have allowed [illegal immigrants] to enter and settle here" and that "the alternative of intensifying interior enforcement or attempting mass deportations would be ... costly, ineffective and inconsistent with our immigrant heritage." H.R. REP. No. 682, 99th Cong., 2d Sess. pt. 1, at 49 (1986), U.S.Code Cong. & Admin.News 1986, pp. 5649, 5653.

As a corollary, Congress also provided for the legalization of *non* immigrants, who entered the country lawfully (for example, as employees or students) but whose presence subsequently became unlawful, so long as their status was unlawful prior to January 1, 1982 and they resided continuously in the United States after that date.[1] Perhaps counterintuitively, then, in order to qualify for legalization under this corollary provision to the general amnesty program, the nonimmigrant had to prove his *illegal* status prior to 1982. That could be accomplished, according to section 245A of the Act, in one of two ways:

> In the case of an alien who entered the United States before January 1, 1982, the alien must establish that the alien's period of authorized stay as a nonimmigrant expired before such date through the passage of time *or the alien's unlawful status was known to the Government as of such date.*

8 U.S.C. § 1255a(a)(2)(B) (Supp. V 1987) (emphasis added).

This case involves the interpretation of the second clause of that provision: what does "known to the Government" mean? In 1987, the INS issued a regulation defining "Government" to mean only the Immigration and Naturalization Service, based on the notion that the Attorney General and the INS were charged with enforcement of the immigration laws (and implicitly responsible for "past failures") and only they could ascertain—truly "know"—that an alien's status was "unlawful." A broader interpretation of "Government," the agency concluded, would make administration of the legalization program difficult and "would vest [other] government agencies with an authority that Congress specifically granted only to the Attorney General." 52 Fed.Reg. at 16,206 (1987). The regulation provided that an alien who originally entered legally could establish that his subsequent illegal status was "known to the Government" prior to 1982 through

one of the following documents: (1) an INS record received from another agency, referring to a clear statement or declaration by the alien to the other federal agency that he was in violation of nonimmigrant status; (2) a record showing an affirmative determination by the INS prior to January 1, 1982 that the alien was subject to deportation proceedings; (3) a copy of a response by the INS to any other agency, stating that a particular alien had no legal status in the United States; or (4) school records which establish that a school forwarded to the INS a report clearly indicating that the applicant had violated his nonimmigrant status prior to January 1, 1982. *Id.* at 16,208; 52 Fed.Reg. at 43,845 (1987).

Under the statute, all aliens seeking to qualify for legalization were obliged to apply for an adjustment of status within a twelve-month period that expired on May 4, 1988. On March 8, only two months before the deadline, appellees, which include four organizations that advise and counsel aliens—Ayuda, Inc., The Ethiopian Community Center, the Latin American Youth Center, and the Mexican American Legal Defense and Educational Fund—and five individual aliens, sued in district court claiming that the INS regulation was based on an impermissible interpretation of the statute. They sought a declaratory order and injunction preventing the INS from applying a "known to the Government" standard that barred an alien from legalization "whenever the federal Government, through *any* of its agencies, departments, bureaus or entities has or had evidence that, separately or in combination, shows that such alien had violated his or her nonimmigrant status prior to January 1, 1982." The government challenged the jurisdiction of the district court, asserting that the organizational plaintiffs lacked standing to sue, and that review of legalization determinations was available only in the court of appeals after an individual claimant had exhausted his administrative remedies and been subject to a deportation or-

---

**1.** Nonimmigrant aliens are special classes of aliens who are lawfully admitted to the United States and have no intention of abandoning permanently their residence in a foreign coun-

try. *See* 8 U.S.C. § 1101(a)(15) (1982). Nonimmigrants include, *inter alia,* foreign students and managerial employees of companies located in the United States.

der entered pursuant to section 242(b) of the Immigration and Naturalization Act, 8 U.S.C. § 1252(b) (1982).

The organizational plaintiffs responded that the normal procedures for administrative determination and judicial review in the courts of appeals designed for aggrieved aliens did not preclude them from bringing an action in the district court pursuant to the APA, because their mission was to advise aliens on how to proceed through the legalization program and, particularly, on their prospects for receiving amnesty. The INS's alleged misconstruction of the statute caused injury to the counseling organizations, they complained, because it impaired their ability to provide accurate information about IRCA eligibility requirements to aliens and required them to expend additional resources to clarify the confusion about the correct legal standard. One organization also asserted that the INS's interpretation of IRCA was unlawful and frustrated the organization's purpose of assisting aliens to obtain legalization. Because the statutory administrative and judicial procedures were not designed to remedy this type of injury, appellees contended APA review was available in district court. The individual plaintiffs asserted that although there is an exclusive statutory mechanism for judicial review of individual legalization determinations, the district court nevertheless had jurisdiction to hear a challenge to the INS's IRCA regulation as long as specific legalization applications were not involved. Appellees argued further that because the May 4, 1988 application deadline was rapidly approaching, an injunction was warranted.

The district court (without reaching the claims of the individual aliens) concluded that the organizational plaintiffs had standing to sue and that judicial review of decisions regarding the legalization program was available in the district court. *Ayuda, Inc. v. Meese*, 687 F.Supp. 650, 654–60 (D.D.C.1988). The court held that the term "Government" in section 245A meant the entire United States Government and not simply the INS, and declared the INS regulation "contrary to law." *Id.* at 666. The INS was also enjoined from "any further application of the regulation" anywhere in the United States, and ordered "to take steps to notify promptly all persons affected by the regulation of the court's decision," *id.*, the court observing that appellee organizations "need certainty in this field, and they need it now." *Id.* at 657. The government acquiesced in the court's interpretation of the statute and did not appeal its order.

The court retained jurisdiction of the case "to assure [the] decree [was] carried out fully and completely and to provide such other and further relief as [might] be necessary to implement [its] decision." *Id.* at 666. Subsequently, the court issued nine supplemental orders dealing with various aspects of the "known to the Government" provision of IRCA. The first supplemental order, issued April 6, 1988, noted that "[a] question has arisen with respect to the precise meaning of the term 'unlawful status was known to the Government,'" and directed that an alien could satisfy the standard by showing that "documentation existed in one or more government agencies so that ... such documentation *taken as a whole* would warrant the finding that the nonimmigrant alien's status in the United States was unlawful." *Id.* (emphasis added). The government has not appealed this supplemental order either.

Eleven new organizations filed a motion to intervene in the case on April 21, 1988. They raised an issue, not previously surfaced, concerning the interrelationship between section 245A of IRCA and former section 265 of the Immigration and Nationality Act, 8 U.S.C. § 1305 (1976), *amended by* 8 U.S.C. § 1305 (1982). Under the latter provision (prior to its amendment on December 29, 1981), every nonimmigrant alien who remained in the United States for more than 30 days was required to report his address to the Attorney General on a quarterly basis. *Id.; see* 8 C.F.R. § 265.1 (1981). Any alien failing to comply with this reporting requirement was subject to deportation unless he could show that such failure was "reasonably excusable or was not willful." 8 U.S.C. § 1306(b) (1982).

The putative intervenors alleged that the INS had been "denying these nonimmigrant aliens [who violated the reporting requirement prior to 1982] the opportunity to apply for legalization, even after this court's clarification of the 'known to the Government' standard in the present litigation."

In other words, the proposed intervenors claimed that the district court's first supplemental order should be interpreted, or extended, to include an alien's *failure* to provide documentation—the quarterly report—which failure might have led the INS to conclude that the alien had slipped into illegal status. The district court never granted the motion to intervene, but appellees adopted the intervenors' claim and sought, over the government's objections, a new supplemental order addressing the issue. The court granted the order—Supplemental Order V—enjoining the INS from denying legalization to nonimmigrants who failed to meet the reporting requirements of section 265, "if INS determines that such aliens have credibly established their willful violation of section 265 and such aliens have also met all other applicable conditions for legalization." 687 F.Supp. at 668. The INS was directed to accept applications from section 265 non-reporters without the statutorily-required filing fee in order to prevent aliens from forfeiting the fee should Supplemental Order V be reversed on appeal. *Id.* The government does appeal this order, in effect challenging the district court's jurisdiction over the entire case (although not contesting the other orders) and, alternatively, disputing the propriety of Supplemental Order V.

## II.

As part and parcel of the amnesty or legalization provisions of IRCA, Congress provided for administrative and judicial review of the application of the Act. According to the government, these provisions require exhaustion of administrative remedies before a party seeks judicial review and vest exclusive jurisdiction in the courts of appeals to review INS decisions that are or could be made in the administrative process. The district court, the government concludes, therefore lacked jurisdiction to entertain the action.

The Act provides: "[t]here shall be no administrative or judicial review of a *determination respecting* an *application* for adjustment of status under this section [the legalization provisions] except in accordance with this subsection." 8 U.S.C. § 1255a(f)(1) (Supp. V 1987) (emphasis added). The Attorney General is directed to "establish an appellate authority to provide for a single level of administrative appellate review of [such] a determination," *id.* § 1255a(f)(3)(A), and "there shall be judicial review of such a denial *only* in the judicial review of an order of deportation under section 1105a of this title." *Id.* § 1255a(f)(4)(A) (emphasis added). That judicial review "shall be based solely upon the administrative record" and the "determinations contained in such record shall be conclusive unless the applicant can establish abuse of discretion or that the findings are directly contrary to *clear* and *convincing* facts contained in the record considered as a whole." *Id.* § 1255a(f)(4)(B) (emphasis added).

■ That standard of review—perhaps even more deferential than the arbitrary or capricious standard and the requirement of substantial evidence on the record as a whole—is about as restrictive as the Congress can fashion. *See Jamesway Corp. v. NLRB*, 676 F.2d 63, 67 n. 4 (3d Cir.1982) (abuse of discretion more deferential than substantial evidence standard); *Bennett v. Tucker*, 827 F.2d 63, 68 (7th Cir.1987) (characterizing abuse of discretion as court's "most deferential standard"). It would appear that even legal questions concerning the interpretation of IRCA are reviewable only under the abuse of discretion standard rather than the companion "contrary to law" formulation of the APA. That is a rare, but not unknown, treatment of reviewability of legal issues. *See Pierce v. Underwood*, —— U.S. ——, 108 S.Ct. 2541, 2546, 101 L.Ed.2d 490 (1988).[2] The legisla-

---

**2.** It may well be that if the substantive issue in this case were presented in the context of an

tive history clearly indicates that this restrictive scope of judicial review was quite purposeful. The Senate version of the bill, despite Senator Cranston's concern that it raised constitutional problems, *see* 129 Cong.Rec. 12,810 (1983),[3] provided for "no judicial review of a decision or determination with *respect to the legalization programs.*" S.REP. No. 132, 99th Cong., 1st Sess. 48 (1985) (emphasis added). The House–Senate conference committee, however, adopted the House version, which included the less restrictive yet very deferential judicial review provisions that make up the present law.

Appellees—including the individual plaintiffs—argue, nevertheless, that their suit in district court could be brought outside the framework of an appeal of a deportation order, because it challenged not a "determination respecting an application for adjustment," but rather an INS policy (drawn from its regulation) that would be applied subsequently in individual cases. In their view, the administrative procedure that must be exhausted applies only to determinations made in individual legalization cases and not to broad challenges to an INS policy or legal position that could apply to many cases. The courts of appeals, it follows, have exclusive review jurisdiction only over the former; the latter sort of proceedings may be brought pursuant to the APA and resting on general federal question jurisdiction (28 U.S.C. § 1331) in the district court to challenge agency "actions," like the issuance of the regulation before us, independent of any specific determination involving an individual alien.

If appellees are correct, such a challenge could be brought not only by an organization alleging an independent injury, but by an individual alien (presumably prior to a denial of legalization), a group of aliens, or an organization representing their interests. These potential plaintiffs would thereby gain significant litigating advantages. For one thing—as happened in this very case—the district court could avoid the difficult analytical problem of discerning the relationship between the "abuse of discretion" scope of review that applies in the courts of appeals and the normal scrutiny given agency interpretations of their organic statutes. More importantly, such an action, particularly if it includes a request for an injunction, could offer the opportunity decisively to influence the INS's behavior all over the country—and do so quickly. *See, e.g., Bresgal v. Brock,* 843 F.2d 1163, 1171 (9th Cir.1987) (nationwide relief may be appropriate even in an individual action); *Decker v. O'Donnell,* 661 F.2d 598, 617–18 (7th Cir.1980) (nationwide injunction appropriate in case of facial challenge to legality of agency regulation). If denials of legalization are appealed to the courts of appeals only after subsequent deportation orders, it would take a good deal more time to gain a judicial judgment on the legality of the INS's interpretation of a statutory term such as "known to the Government." The courts of appeals, moreover, may well differ in their views as to the legality of the INS's construction of the statute. Even were the INS to acquiesce in an unfavorable judicial interpretation in one circuit,[4] it would surely not be

---

appeal to a court of appeals, the court's scope of review and deference to agency's interpretation would not differ markedly from the APA. Almost surely, constitutional questions, for instance, would be subject to review *de novo. Cf. Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 2053, 100 L.Ed.2d 632 (1988) ("[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear."). And the relationship between the "abuse of discretion" standard and the deferential scope of review under the second prong of *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), is a subtle analytical matter. Suffice it to note that Congress used an unusually restrictive scope of review in IRCA.

3. Senator Cranston's comments came during debate over an immigration reform bill in the 98th Congress, which included the same bar to judicial review as the bill passed by the Senate in the 99th Congress.

4. Whether an agency is *required* as a matter of law to acquiesce in an unfavorable ruling when future cases arise in the same circuit court of appeals is a matter of much debate. *See generally,* Note, *Agency Nonacquiescence: Implementation, Justification, and Acceptability,* 42 Wash. & Lee L.Rev. 1233 (1985); Note, *Administrative Agency Intracircuit Nonacquiescence,* 85 Col.L. Rev. 582 (1985). Some agencies—particularly the Social Security Administration, the Internal

obliged to do so in other circuits that had not decided the question. And, of course, an unfavorable ruling in one circuit would not prevent the INS from continuing to follow its interpretation of the statute in other cases nationwide. *United States v. Mendoza,* 464 U.S. 154, 160–63, 104 S.Ct. 568, 572–74, 78 L.Ed.2d 379 (1984).

█ Whether or not the judicial review provisions of IRCA preclude direct recourse to the district court to challenge the INS's construction of the statute embodied in a regulation depends, of course, on congressional intent. Paradoxically, appellees' construction of those IRCA provisions suggests that Congress wished to channel to the courts of appeals only the application of the statute in presumably less important individual cases while reserving to initial district court review (albeit subject to subsequent appeal) the much more important cases involving broad questions of statutory construction that would apply to a whole class of aliens. *But cf.* H.R.REP. NO. 1086, 87th Cong., 1st Sess. 28 (1961), U.S. Code Cong. & Admin.News 1961, pp. 2950, 2972 ("Since deportation proceedings deal with the liberty of persons rather than mere property, the committee has concluded that granting an initial review in an appellate court gives the alien greater rights, greater scrutiny, and more assur-

ance of a close study of his case by experienced judges."). While some courts have found that allocation of jurisdiction appropriate under the judicial review provisions of section 106, apparently because they believed the only purpose of exclusive court of appeals jurisdiction was to prevent piecemeal litigation by aliens in the district courts that would delay deportation, *see, e.g., Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1033 (5th Cir.1982) (discussed *infra* ), we do not believe Congress intended that result under IRCA.[5] The language and structure of IRCA, as well as its legislative history, do not support appellees' interpretation.

Appellees argue that the challenged regulation and its applicability to section 265 do not constitute a "determination respecting *an application* for adjustment," reviewable only in the courts of appeals, because it is not a ruling on an actual application. Indisputably, however, the regulation embodies determinations that will impact, and therefore are "respecting," future individual applications. We do not understand appellees to contend that "an application" applies only to an individual claim; surely a "determination" might be made in a proceeding in which several applications were consolidated. Rather, appellees seem to argue that the statutory exhaustion re-

Revenue Service, and the National Labor Relations Board—have adopted explicit policies of intracircuit nonacquiescence, and have argued, *inter alia,* that their policy is justified by the need to guarantee nationwide uniformity of laws, rules, and regulations to all claimants. Although some courts have expressed disapproval of intracircuit nonacquiescence, *see, e.g., Ithaca College v. NLRB,* 623 F.2d 224, 228–29 (2d Cir.1980), *cert. denied,* 449 U.S. 975, 101 S.Ct. 386, 66 L.Ed.2d 237 (1980); *Allegheny Gen. Hosp. v. NLRB,* 608 F.2d 965, 970 (3d Cir.1979), and even suggested that it might be unconstitutional, *Stieberger v. Heckler,* 615 F.Supp. 1315, 1363 (S.D.N.Y.1985), *vacated on other grounds sub. nom. Stieberger v. Bowen,* 801 F.2d 29 (2d Cir.1986), we have never decided the issue. *Compare Yellow Taxi Co. v. NLRB,* 721 F.2d 366, 383 (D.C.Cir.1983) (opinion of MacKinnon, J.) (admonishing the Board "to halt its apparently *willful* defiance of long established, controlling judicial precedent") *with id.* at 384 (Wright, J., concurring) (refusing to concur in condemnation of Board's intracircuit nonacquiescence) *and id.* at 385 (Bork, J., concurring) (declining

to agree or disagree with criticism of Board but noting that "[a]n agency with nationwide jurisdiction is not required to conform to every interpretation given a statute by a court of appeals"). Even the most vociferous critics of intracircuit nonacquiesence have conceded the validity of the policy in at least some instances. *See Stieberger,* 615 F.Supp. at 1365–66.

**5.** In enacting section 106 itself, Congress seems to have been more broadly concerned with "unjustified" litigation, even "unjustified attacks upon the constitutionality of the Immigration and Nationality Act" by "astute attorneys who know how to skillfully exploit the judicial process." H.R.REP. No. 1086, 87th Cong., 1st Sess. 23 (1961), U.S.Code Cong. & Admin.News 1961, p. 2967. Of course, jurisdiction could not turn on the justification (merits) of a claim, but Congress' concern about attorneys' skill in using the judicial process to frustrate deportation proceedings by such devices as forum shopping, *see id.* at 28–29, seems relevant to the *HRC v. Smith* exception—and perhaps even more pertinent to the instant case.

quirements and judicial review provisions are confined to determinations made *after* an application is filed. But the phrase *"respecting* an application" on its face does not appear to be so limited. *Cf. Heckler v. Ringer,* 466 U.S. 602, 621, 104 S.Ct. 2013, 2024, 80 L.Ed.2d 622 (1984) (defining the word "claim" under the Medicare Act to include a challenge to agency policy that allegedly would prevent the plaintiff from getting an operation upon which a claim would be based).[6]

■ The dissent, nevertheless, counters that the "determination" to which subsection 245A(f)(1) refers must be more narrowly interpreted, since it must be the same determination referred to by subsection 245A(f)(3)(A)—"The Attorney General shall establish an appellate authority to provide for a single level of administrative appellate review of a determination described in paragraph (1)"—and it could not be thought that a regulation could be challenged in that administrative proceeding. Dissent at 8–12. We do not understand why that is so. Indeed, if the statutory interpretation embodied in the regulation were to be challenged in the court of appeals after a deportation order, it would have to be first raised in the administrative proceeding, because "judicial review shall be based *solely* upon the administrative record." *See* 8 U.S.C. § 1255a(f)(4)(B). It may well be that the administrative appellate authority would consider itself bound by a regulation issued by the INS, but that does not necessarily suggest its interpreta-

tion of the regulation is pre-ordained. That the LAU may be limited as to its scope of review of a determination (or that part of a determination) embodied in a regulation does not suggest that it cannot review the determination.[7] Quite commonly, when reviewing agency applications of their own regulations, we see a somewhat different result than might have been expected. The doctrine of special judicial deference to administrative agency adjudicatory interpretation of agency regulations grows out of just that experience. *See Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The dissent, by characterizing the "determination" reviewable in the courts of appeals as "fact-specific," Dissent at 1347, 1352–1353 n. 5, seems to suggest that such review was not intended to encompass legal questions of statutory interpretation, which were instead to be left to the district courts if and when the INS somehow manifested its statutory interpretations other than in an adjudication. Of course, as we have suggested, that is a rather peculiar way to divide jurisdiction between courts of appeals and district courts. Moreover, in subsection 245A(f)(4)(B), Congress said "findings of fact *and* determinations" shall be conclusive, thereby recognizing that questions of law were meant to be incorporated in the word "determination." *See* 8 U.S.C. § 1255a(f)(4)(B) (Supp. V 1987).

Since the INS was authorized but not obliged to issue regulations interpreting the statutory language,[8] it could have wait-

6. Contrary to the dissent's assertion, Dissent at 9, Congress does not appear to have used the terms "on the application" and "respecting an application" interchangeably. Subsection 245A(f)(1), which uses the term "respecting," refers to both administrative *and judicial* review of legalization determinations. Since judicial review may well be broader than administrative review because only courts would likely declare a regulation invalid as applied (rather than interpret and apply agency regulations), it is quite natural for Congress to use the broad term when referring to judicial review and the narrower term when discussing only administrative review.

7. Of course, the LAU would not, as the dissent suggests, Dissent at 9–10, be reviewing a facial challenge to the regulation, but rather an application of the regulation to an individual. Facial

challenges to the regulation are not permitted, because subsection 245A(f)(3) provides that "administrative appellate review shall be based solely upon the administrative record established at the time of the determination *on the application.*" 8 U.S.C. § 1255a(f)(3) (Supp. V 1987). The use of the term "on" in this subsection illustrates that *the LAU* may hear only cases involving challenges to determinations on individual applications for adjustment, and again underscores the significance of Congress' use of the broader term *"respecting* an application" when referring to *judicial* review. *See infra* note 6.

8. *See* 8 U.S.C. § 1255a(g) (Supp. V 1987). The INS was *required* to issue regulations on only one issue—the definition of the statutory term "resided continuously." *Id.* § 1255a(g)(1)(A).

ed until individual legalization proceedings before demonstrating its interpretation of the "known to the Government" language. In that event, surely the courts of appeals would have had, and been expected to exercise, authority to review the agency's interpretation (giving appropriate deference) in the context of individual deportation cases. *See INS v. Chadha*, 462 U.S. 919, 938, 103 S.Ct. 2764, 2778, 77 L.Ed.2d 317 (1983). By not requiring the INS to issue regulations that provided an administrative interpretation of statutory language—and not providing a separate mechanism for judicial review of such regulations—Congress must have assumed that the agency's statutory interpretations would be reviewed only in the context of appeals from deportation orders. It seems inconceivable that Congress would have wished instead to closely circumscribe judicial review of legalization decisions that applied whatever regulations the INS issued, and at the same time to allow APA challenges to such regulations in almost any district court of the United States. Indeed, if the district court or any court had jurisdiction to review directly the INS's regulations interpreting IRCA (if issued), Congress would have created a disincentive to issuance of those regulations—which hardly accords with the desirability of providing aliens with prompt information as to the government's interpretation of the statute.

Once it is recognized, as it must be, that an alien could challenge, on appeal from a deportation order, an interpretive regulation which causes the INS to deny his legalization claim, it follows that the district court lacked jurisdiction to hear the same claim in a different forum. For subsection 245A(f)(4)(A) of IRCA limits judicial review of "such" denials to review of deportation orders. Congress thereby explictly prohibited an alien from mounting two parallel challenges to the same regulation. The dissent nevertheless reads the statute to permit an alien to challenge in the district court a regulation that would affect him—apparently before he files a

"piece of paper" seeking legalization—and then, in a duplicate procedure, to challenge the same regulation on appeal from a deportation order. Under those circumstances we could have two cases before us: one on appeal from the district court, and one on appeal from a deportation order raising essentially the same claims. It is not at all clear that in light of that possibility the district court could have jurisdiction even in the absence of subsection 245A(f)(4)(A), *see Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 77–79 (D.C.Cir. 1984); *Investment Co. Inst. v. Board of Governors*, 551 F.2d 1270, 1278–80 (D.C. Cir.1977), but, in any event, the presence of subsection 245A(f)(4)(A) makes it evident that the district court lacks power to entertain the same claim that could be brought to the court of appeals.

The statute's legislative history indicates Congress intended aliens to come forward during the 12–month eligibility period because "this is the first call and the last call, a one shot deal." 132 Cong.Rec. S16,888 (daily ed. Oct. 17, 1986) (remarks of Sen. Simpson). If aliens did not make a legalization claim during that window period, it was lost forever. An alien could not defend against a deportation order based on a claim of legalization if the claim was not made during the designated twelve months. *See* 8 U.S.C. § 1255a(a)(1) (Supp. V 1987). Accordingly, Congress provided for QDEs to advise aliens as to the validity of this claim: "We are not trying to fool you this time." 132 Cong.Rec. S16,888 (daily ed. Oct. 17, 1986) (remarks of Sen. Simpson). But the QDEs were forbidden to make "a determination required by [the statute] to be made by the Attorney General." *Id.* § 1255a(c)(3). It was, therefore, the Attorney General's interpretation of IRCA that Congress expected to have the primary operational impact during the 12–month period.[9]

The dissent ascribes to Congress an interest in providing the alien with "accurate information," Dissent at 28, and that is

---

9. Of course, if a case had come to the court of appeals on review of a deportation order that raised the section 265 issue, we would have had

before us the agency's construction of that term as it applied to a particular applicant.

undeniable. Accurate, certainly, as to the Attorney General's interpretation of the statute and, perhaps also, the QDEs' best appraisal of whether the courts of appeals (and the Supreme Court) would sustain that interpretation. If, for instance, an alien would not qualify for legalization based on the Attorney General's interpretation of IRCA as a QDE or a private attorney understood it, but the counselor thought the interpretation would not be sustained on review of a deportation order, the alien could rely on the advice and file an application for legalization. Whether the alien ultimately prevailed on appeal from a deportation order would depend—as is typically the case—on the quality of advice he received. Only an advisory opinion from the Supreme Court would totally remove any uncertainty, and Congress could not provide for that even if it wished to.

The dissent, although not the district court, appears to find a congressional intent to provide aliens with more than the Attorney General's interpretation of the statute during the window period. It is argued that they were entitled to authoritative judicial review and correction of the Attorney General's misinterpretations ("egregious" or otherwise), see Dissent at 1356, *before the 12-month period lapsed*. If that were so, Congress would certainly have required the Attorney General quickly to issue regulations covering all foreseeable applications of the statute, *cf., e.g.,* Office of Federal Procurement Policy Act Amendments of 1988, Pub.L. No. 100–679, § 6, 102 Stat. 4055, 4067 (1988) (all implementing regulations "shall be issued ... within 180 days after the date of enactment"), and also provided for a special expedited judicial review of those regulations in a particular court of appeals. *See Yakus v. United States*, 321 U.S. 414, 440 n. 7, 64 S.Ct. 660, 674–75 n. 7, 88 L.Ed. 834 (1944) (Congress provided for expedited judicial review in Emergency Court of Appeals of regulations implementing The Emergency Price Control Act); Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6924, 6976 (1982 & Supp. V 1987) (EPA Administration required to promulgate certain regulations within eighteen months, and judicial review allowed only in D.C. Circuit within ninety days of issuance).

Congress was surely well aware, when it placed review of agency action in the courts of appeals, that it could take a long time—and often require Supreme Court intervention—before legal uniformity was achieved. That is merely one of the characteristics of our system of federal appellate review, which Congress may avoid if it so wishes. *See, e.g., United States v. Fausto*, 484 U.S. 439, 108 S.Ct. 668, 674, 98 L.Ed.2d 830 (1988) (exclusive review of Merit System Protection Board decisions placed in Federal Circuit to avoid varying decisions in lower federal courts). To permit one federal district court to short-circuit this process is inconsistent with the system of appellate review provided in the statute. Appellees' approach fundamentally alters the relationship between the Executive Branch and the federal judiciary that Congress decreed, because one district court (supported, if necessary, by one court of appeals) could force the Executive Branch to change its interpretation of a statute. As noted above, a decision by a court of appeals against an agency in an individual case does not bind the agency in other circuits, and perhaps not even in other cases within the same circuit. *See supra* at 1330–1331.

If anything, the legislative history suggests that Congress, rather than considering such extensive judicial monitoring of the legalization program, only grudgingly provided *any* judicial review even in the context of deportation orders. The choice for the conference committee was between the House version, which was adopted, and the Senate version, which precluded *any* judicial review "of a decision or determination with respect to the legalization programs." Although we do not propose a general canon of construction that ambiguous statutes be interpreted in favor of the house of Congress that acquiesces in the eventual text, we think it unlikely that the Senate would have agreed to the House language with the understanding that it permitted not only review of legalization

determinations in the courts of appeals after deportation orders but also even more expansive, intrusive, and direct review of policy determinations that would or could lead to denials of applications for adjustment. As the dissent concedes, Dissent at 1353, the Senate bill "would clearly have precluded review of rulemaking as well as adjudication"—i.e., all review of the legalization programs. The leading opponent of the Senate provision, who sought to substitute an amendment "identical to the language proposed by the House committee," believed his change would "merely permit[ ]" a "very limited form of judicial review" that "would be available only when an improper denial of legalization is raised as a defense in a deportation proceeding already subject to judicial review." 129 Cong.Rec. 12,810 (1983) (statement of Sen. Cranston). The more plausible interpretation of the Senate's acquiescence, therefore, is that an IRCA determination is reviewable *only* in the context of cases brought to the courts of appeals pursuant to section 106 of INA.[10]

Appellees argue that section 106, which provides for court of appeals review of orders issued in deportation proceedings, has itself been interpreted *not* to preclude suits in the district court to challenge agency policies, so it is therefore inappropriate to conclude Congress meant to exercise any tighter rein over IRCA, which channels applicants into deportation proceedings reviewed under section 106. The restrictive judicial review provision of section 106 is "the sole and exclusive procedure for[ ] the judicial review of all final orders of deportation," 8 U.S.C. § 1105a(a) (1982), and it includes the precondition that "[a]n order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him...." *Id.* § 1105a(c). The

Supreme Court has never directly determined whether this section precludes a challenge to agency regulations in the district court *before* the initiation of deportation proceedings. But the Court has read "final orders of deportation" to include "all determinations made during the incident to the administrative proceeding conducted by a special inquiry officer, and reviewable *together* by the Board of Immigration Appeals," *Foti v. INS,* 375 U.S. 217, 229, 84 S.Ct. 306, 313–14, 11 L.Ed.2d 281 (1963) (emphasis added), and all such determinations are within the exclusive jurisdiction of the courts of appeals. *Id.; see also Giova v. Rosenberg,* 379 U.S. 18, 85 S.Ct. 156, 13 L.Ed.2d 90 (1964) (denial of motion to reopen deportation proceedings reviewable only under section 106). Although the Court has interpreted section 106 to permit an alien to challenge separately in district court an INS denial of a stay of deportation, issued in an entirely separate proceeding three months *after* a final order of deportation, *Cheng Fan Kwok v. INS,* 392 U.S. 206, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968), it has suggested that any matter "governed by the regulations applicable to the deportation proceeding itself, and ... ordinarily presented for disposition to the special inquiry officer who enter[s] the deportation order" is within the exclusive jurisdiction of the courts of appeals. *Id.* at 217, 88 S.Ct. at 1976. Most recently, in *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the Court squarely held that section 106 "includes all matters on which the validity of the final order [of deportation] is contingent, *rather than only those determinations actually made at a hearing,"* *id.* at 938, 103 S.Ct. at 2777 (quoting *Chadha v. INS,* 634 F.2d 408, 412 (9th Cir.1980)) (emphasis added).

Appellees do have a point, however; as we have noted, lower federal courts have allowed certain plaintiffs to avoid the ex-

---

**10.** The dissent, starting from the assumption that "determinations respecting an application" as used in the House bill does not refer to rulemaking, argues that Senator Cranston attempted to adopt the section of the House bill permitting judicial review *after* an order of deportation but not that part allowing separate review of regulations. However, we think Sena-

tor Cranston's statement that his amendment was "identical to the language proposed by the House committee" implicitly, if not explicitly, indicates that he thought his amendment would result in equivalent judicial review provisions in the two bills, and thus that "determinations respecting an application" includes regulations.

haustion requirement and corresponding exclusive court of appeals jurisdiction under section 106. The Fifth Circuit, in *Haitian Refugee Center v. Smith*, 676 F.2d 1023, 1033 (5th Cir.1982) [hereinafter *HRC v. Smith*], was faced with a broad attack on the practices of immigration judges who heard asylum claims during deportation hearings, and held that an allegation of "a program, pattern or scheme by immigration officials to violate the constitutional rights of aliens is ... a separate matter subject to examination by a district court and to the entry of at least declaratory and injunctive relief." The court read the grant of exclusive jurisdiction to the courts of appeals as applying only to actions taken in individual deportation proceedings that may affect the determination of the merits of a claim, and authorized any district court "to wield its equitable powers when a wholesale, carefully orchestrated, program of constitutional violations is alleged." *Id.* Although the Fifth Circuit emphasized the narrowness of its holding and promised not to condone any "end-run around the administrative process," *id.*, the application of *HRC v. Smith* has proliferated to the point where it now more nearly resembles a gaping hole in the middle of the INS's defensive line. Other courts have adopted the Fifth Circuit's distinction under section 106 between review of individual deportation orders and broad-based challenges to agency policy on both constitutional and statutory grounds. *Jean v. Nelson*, 727 F.2d 957, 979–81 (11th Cir.1984) (en banc), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) (expressing no view on jurisdictional issues); *Salehi v. District Director*, 796 F.2d 1286, 1290 (10th Cir.1986); *Orantes–Hernandez v. Meese*, 685 F.Supp. 1488, 1503 (C.D.Cal.1988); *Hotel & Restaurant Employees Union v. Smith*, 563 F.Supp. 157, 162 (D.D.C.1983) (denying motion to dismiss), *summary judgment granted for defendant*, 594 F.Supp. 502 (D.D.C.1984),

*aff'd by an equally divided court*, 846 F.2d 1499 (D.C.Cir.1988) (en banc); *Orantes–Hernandez v. Smith*, 541 F.Supp. 351, 364 (C.D.Cal.1982).

*HRC v. Smith* and its progeny, however, are not only unsupported by the Supreme Court's cases on section 106, including the subsequently decided *Chadha*, but appear inconsistent with the reasoning of the Supreme Court in *Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). The Court there was faced with a challenge to a ruling issued by the Secretary of Health and Human Services that precluded payment under Medicare for a particular surgical procedure. The Medicare Act permits judicial review of "any claim arising under" the Act, via 42 U.S.C. § 405(g), only after a claimant seeks payment and exhausts administrative remedies. The plaintiff, Ringer, wished to undergo that procedure, which he could not afford without Medicare reimbursement. He sued in district court for a declaratory judgment, arguing that he was not obliged to exhaust, because he did not yet have a claim and was instead challenging an agency ruling that, in effect, precluded his claim. The Supreme Court refused to accept that distinction, holding that Ringer was "clearly seeking to establish a right to future payments should he ultimately decide to proceed with [the particular] surgery." *Id.* at 621, 104 S.Ct. at 2024. It recognized that to hold otherwise would allow claimants "to bypass the exhaustion requirements of the Medicare Act by simply bringing declaratory judgment actions in federal court before they undergo the medical procedure in question." *Id.* To be sure, unlike *HRC v. Smith*, *Ringer* did not present a constitutional claim, but the *HRC v. Smith* line of cases has not been limited to constitutional challenges. *See, e.g., Jean v. Nelson*, 727 F.2d at 980 n. 32.[11]

---

11. The dissent's extensive discussion of *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), is largely beside the point. *Michigan Academy* did not even question *Ringer*, and the latter case still supports the general propositions that an individual plaintiff may not circumvent a statu-

tory exhaustion requirement by bringing a preemptory declaratory judgment action. Even the plaintiffs in *Michigan Academy* read *Ringer* to mean that "whatever specific procedures [Congress] provided for judicial review ... were exclusive, and could not be circumvented by resort to the general jurisdiction of the federal

We have not been obliged to decide whether there is a "program" exception to section 106—for constitutional or statutory claims—that permits a suit by aliens or those representing them,[12] and we think it is unnecessary to do so here. However, several district courts have applied the Fifth Circuit's approach under section 106 to the judicial review provisions of IRCA. *Doe v. Nelson,* 703 F.Supp. 713, 720–22 (N.D.Ill.1988) (finding *HRC v. Smith* indistinguishable); *Immigration Assistance Project v. INS,* No. C88379R, slip op. at 10–11 (W.D.Wash. Nov. 2, 1988) (citing *HRC v. Smith* ); *Haitian Refugee Center v. Nelson,* 694 F.Supp. 864, 873–74 (S.D. Fla.1988) (citing *HRC v. Smith* and reasoning that "[t]o deny jurisdiction would be to allow illegal agency action to go unchallenged"); *Zambrano v. INS,* No. S–88–455, slip op. at 6–7 (E.D.Cal. Aug. 9, 1988). We find these cases unpersuasive; they do not

focus on the language and legislative history of ICRA. We think whatever the proper interpretation of section 106 as it relates to "final orders of deportation," IRCA's judicial review provisions, although employing the section 106 machinery, have a broader preclusive effect. It is arguable, for example, that certain INS actions—other than those under IRCA—taken before initiation of deportation proceedings are reviewable in the district court under APA standards, despite the exclusivity provision of section 106. *Cf. Hotel and Restaurant Employees Union v. Smith,* 846 F.2d at 1513 n. 2 (opinion of Silberman, J.) (assuming without deciding that an alien could sue to gain direct review of a denial of asylum without waiting for a deportation proceeding); *but see Kashani v. Nelson,* 793 F.2d 818, 826–27 (7th Cir.), *cert. denied,* 479 U.S. 1006, 107 S.Ct. 644, 93 L.Ed.2d 701 (1986).[13]

courts." *Michigan Academy,* 476 U.S. at 679, 106 S.Ct. at 2140. No circumvention problem was present in *Michigan Academy,* because Congress had not imposed an exhaustion requirement on claims arising under Part B of the Medicare program.

Unlike *Ringer,* which concerned part A of Medicare, *Michigan Academy* raised the entirely different question whether Congress had altogether precluded review of statutory and constitutional challenges under part B. This was so, because in *United States v. Erika, Inc.,* 456 U.S. 201, 208, 102 S.Ct. 1650, 1654, 72 L.Ed.2d 12 (1982), the Court had interpreted the Medicare Act to preclude judicial review of Part B amount determinations. And those determinations were made by insurance carriers who were not authorized to consider legal challenges to the Act or regulations. The Court thus declined to deem the regulation at issue in *Michigan Academy* an "amount determination," because that would have prevented *any* judicial review of the rule and raised "serious constitutional issues." *Id.* at 680–81 & n. 12, 106 S.Ct. at 2140–41. That is, of course, not the case in *Ringer* or in IRCA, where review of a rule affecting future claims or applications is available after exhaustion of administrative remedies. In any event, nothing in IRCA suggests that the exclusive review procedure is limited to "quite minor matters," *cf. Michigan Academy,* 476 U.S. at 680, 106 S.Ct. at 2140, that could affect an application for adjustment. As noted above, *supra* at 1331–32, Congress must have expected major legal questions to be resolved in legalization adjudications.

Nor does *Michigan Academy* provide any support for the notion that the appellee organizations can challenge agency regulations in dis-

trict court, although individual aliens are required to seek review only in the deportation context. *Cf.* Dissent at 1360–61. Clearly, the organizational plaintiffs in *Michigan Academy* could challenge regulations in district court *in the same manner as the individual plaintiffs could do so.* But nothing in *Michigan Academy* suggests that an organization could have sued directly in *Ringer,* where the individual claimant was required to exhaust administrative remedies. And the dissent does not even mention *Block v. Community Nutrition Institute,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), the Supreme Court's most recent thorough discussion of preclusion of review under the APA. *See infra* at 1339–40.

12. In *Hotel & Restaurant Employees Union v. Smith,* 846 F.2d 1499 (D.C.Cir.1988) (en banc) (equally divided court), four members of the court assumed that the exhaustion requirement of section 106 does not apply to "a general challenge to the INS's entire frameworking for processing applications." *Id.* at 1506 (opinion of Mikva, J.). The other half of the court, citing *International Union, UAW v. Brock,* 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), noted that it "may well be" that such an exception exists, but found it unnecessary to examine this contention in depth since they resolved the case on other jurisdictional grounds. *Id.* at 1514 (opinion of Silberman, J.).

13. It will be recalled that the specific actions challenged in *HRC v. Smith* were denials of asylum requested in the deportation hearings themselves rather than prior to such proceedings. Because a denial of asylum might be reviewable before deportation proceedings, the argument that denials during the proceedings

IRCA, however, provides for an alien to seek review of a denial of legalization *only* in the context of a deportation proceeding, *see* 8 U.S.C. § 1255a(f)(4)(A) (Supp. V 1987), so we are not confronted with an argument that APA review could be predicated on the denial of legalization by itself. It is crystal clear—at least with regard to IRCA—that Congress closed that door.

Appellees also rely on *International Union, UAW v. Brock,* 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), to support the district court's order. *Brock* concerned the implementation of the Trade Act of 1974, as amended, 19 U.S.C. §§ 2101–2495 (1982 & Supp. V 1987), which established a program of trade readjustment allowance (TRA) benefits for workers who have lost their jobs because of import competition, and provides, *inter alia,* that "[a] determination by a cooperating State agency with respect to entitlement to program benefits under an agreement is subject to review in the same manner and to the same extent as determinations under the applicable State [unemployment insurance] law and *only* in that manner and to that extent." *Id.* § 2311(d) (emphasis added); *see id.* § 2319(10). The Court held that the Act authorized a union to sue in federal district court on behalf of its members to challenge a Trade Act regulation issued by the Secretary of Labor, which governed state determinations, notwithstanding the judicial review provision. But *Brock* is distinguishable from *Ringer* (not mentioned in the Court's opinion) and our case, because Congress never intended TRA claimants to exhaust state remedies when challenging the federal guidelines. The Trade Act was passed against a background of a line of cases in the Supreme Court and lower federal courts holding that there is federal jurisdiction to review state unemployment

insurance claims that raise questions of federal law. *See Brock,* 477 U.S. at 285, 106 S.Ct. at 2530.[14] And on its face, the exhaustion requirement in the Trade Act refers only to "determination[s] by a *cooperating State agency.*" If the Trade Act had said—paralleling IRCA—that *any* (federal or state) determination with respect to program benefits was reviewable *only* through the state process, the cases would be more alike.

■ We do not therefore take *Brock* to mean that in order to confine litigants to administrative procedures reviewable only by certain courts, Congress must affirmatively state that other courts may not hear the same questions if raised in a different form. Often an exclusive procedure for judicial review in the courts of appeals will implicitly, if not explicitly, forbid broad-based challenges to agency practice in the district courts. *Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.,* 379 U.S. 411, 422, 85 S.Ct. 551, 558, 13 L.Ed.2d 386 (1965) (Where Congress "has enacted a specific statutory scheme for obtaining review, ... the doctrine of exhaustion of administrative remedies comes into play and requires that the statutory mode of review be adhered to notwithstanding the absence of an express statutory command of exclusiveness."); *Telecommunications Research and Action Center v. FCC,* 750 F.2d 70, 77 (D.C.Cir.1984); *see also* 5 U.S.C. § 702 (1982) ("Nothing herein ... confers authority to grant relief if any other statute *expressly or impliedly* forbids the relief which is sought.") (emphasis added). The IRCA judicial review provision sets forth that kind of procedure. It limits judicial review of any "determination respecting an application for adjustment" to the courts of appeals, 8 U.S.C. § 1255a(f) (Supp. V 1987), and if we were to uphold

---

are not separately reviewable rests on less powerful—if not insignificant—grounds. *See Foti,* 375 U.S. at 229, 84 S.Ct. at 313–14; *International Union, UAW v. Brock,* 477 U.S. 274, 294, 106 S.Ct. 2523, 2535, 91 L.Ed.2d 228 (1986) (White, J., dissenting).

**14.** Even three of the dissenters in *Brock,* who were in the majority in *Ringer,* seemed to recognize the difference between the cases when they

said "[t]he distinction between a challenge to the guideline and a challenge to benefit determinations might be meaningful if petitioners had only challenged the application of the guidelines to as-yet-unsubmitted claims." *Brock,* 477 U.S. at 294, 106 S.Ct. at 2535 (White, J., dissenting). The dissent was limited to the proposition that petitioners could not interrupt the state administrative review process once it had begun to consider claims under submission.

the district court's authority to enter declaratory and injunctive relief, we would destroy much of the system that Congress crafted.

The district court appeared to agree with our analysis as it affects *individual* plaintiffs,[15] but thought that some of the *organizational* appellees were authorized to challenge the INS policies in district court because of their special status as "qualified designated entities" (QDEs). Since these organizations had no administrative process to which they could appeal, the court reasoned that they must have a remedy somewhere, and that somewhere was federal district court. *Ayuda,* 687 F.Supp. at 660.

In support of the district court, appellees argue that the QDEs' special role in the legalization program implies they are entitled to sue in district court to challenge the INS's regulation even if an alien subject to deportation were not. The Attorney General was obliged under IRCA to "designate qualified voluntary organizations" to assist in the legalization process. 8 U.S.C. § 1255a(c)(2) (Supp. V 1987). Congress, understanding an illegal alien's apprehensions, wished to "assure applicants that they may apply to such entities without fearing that their applications will be forwarded to the INS even if in the view of such entities they do not qualify for legalization." S.Rep. No. 132, 99th Cong., 1st Sess. 47 (1985). Since the QDEs' very function was to provide a buffer—a confidential intermediary—between the INS and the alien, appellees insist Congress could

not have intended that they would have no independent right to sue. The QDEs and the other organizations claim they are injured—apart from any injury suffered by the aliens—because their ability to advise aliens is impaired by the "uncertainty" caused by the government's regulation and particularly its problematic application to the section 265 issue.

The government responds that the QDEs under IRCA are actually agents of the INS. Cooperative agreements between the Department of Justice and the QDEs direct that the latter "will comply with all relevant INS regulations relating to the legalization ... programs and follow the instructions in the INS Training Manual," and the statute forbids the QDEs from making "a determination required by [IRCA] to be made by the Attorney General." 8 U.S.C. § 1255a(c)(3) (Supp. V 1987). We thus find much force to the government's argument that the QDEs' interest is so "inconsistent with the purposes implicit in the statute" that they lack standing to sue. *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). It seems to us that Congress, at most, intended the QDEs to act as intermediaries, not litigating ombudsmen. And even if the QDEs are thought of as agents for the aliens, we doubt Congress intended the agents to have broader rights to seek judicial review than do the principals.

But even assuming that the appellee organizations have standing to sue, we think the district court lacked authority to hear

15. The district court engaged in the following colloquy with appellees' counsel, after counsel asserted that the individual plaintiffs presented the strongest case for jurisdiction.

THE COURT: Well, but the individual plaintiffs, it would seem to me, they would—why wouldn't they have to go through the administrative process? ... [I]t seems to me that they can have their status determined through the administrative process.

COUNSEL: I think, Your Honor, they cannot because ... to do so would be a futile act. We have heard testimony. We have presented affidavits to show that the INS is not changing its opinion.

THE COURT: Why is it futile?

COUNSEL: Because they could never get a reversal in the administrative process.

THE COURT: No, but that's not the standard. The standard is that as long as they can get a reversal in the Court of Appeals.... And it would seem to me that they could then have this case go to the Court of Appeals and the Court of Appeals could say ... it was a bad interpretation. Am I wrong on that? Don't they have an appeal right here? If an individual goes and applies and he's turned down, and he goes up on appeal, can't the Court of Appeals reverse that?

COUNSEL: Yes, obviously, the Court of Appeals could reverse it, and for those individual plaintiffs, the Court of Appeals could do that. It could reverse it.

their claim, because to do so would clearly frustrate congressional intent to channel all disputes about the legalization program into the courts of appeals under a narrow scope of review. The flaw in the district court's analysis, in our view, is its assumption that every aggrieved party must have a remedy under the statute. It did not consider that Congress sometimes intends to preclude suits by certain classes of plaintiffs, *see* 5 U.S.C. § 701(a)(1) (1982) (judicial review under the APA not available when precluded by statute), and we think a "balanced approach to statutory construction," *Block v. Community Nutrition Inst.*, 467 U.S. 340, 350, 104 S.Ct. 2450, 2456, 81 L.Ed.2d 270 (1984), reveals that a congressional purpose in IRCA to preclude judicial review by anyone, except in the deportation context, is " 'fairly discernible in the statutory scheme.' " *Id.* at 351, 104 S.Ct. at 2456 (quoting *Data Processing v. Camp*, 397 U.S. 150, 157, 90 S.Ct. 827, 831–32, 25 L.Ed.2d 184 (1970)).

In *Block*, the Court faced a jurisdictional challenge to an action brought under the APA by consumers disputing the legality of the Secretary of Agriculture's milk marketing orders. The government claimed the consumers lacked standing, but the court did not find it necessary to reach that issue because it determined, instead, that the statute barred consumers from seeking judicial review—a ruling which the court described as "in effect" jurisdictional. *Id.* 467 U.S. at 353 n. 4, 104 S.Ct. at 2455–56 n. 4; *see also Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399–400, 107 S.Ct. 750, 757–58, 93 L.Ed.2d 757 (1987). Since the statute provided "a detailed mechanism for judicial consideration of particular issues at the behest of particular persons [milk handlers], judicial review of those issues at the behest of *other persons* [was] found to be impliedly precluded." *Id.* 467 U.S. at 349, 104 S.Ct. at 2455 (emphasis added). That detailed mechanism required milk handlers to exhaust administrative remedies before. seeking judicial review in *district court.* Although the Court had previously held that producers could seek judicial review despite no statutory provision authorizing such suits, *Stark v. Wick-*

*ard,* 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944), the Court in *Block* explained that the producers' interest in *Stark*, which involved a challenge to the Secretary's administration of the fund from which the producers would be paid, could not be protected by the statutory provisions authorizing suits by the handlers, since the latter had no interest in the fund. Therefore, Congress did not intend to preclude suits by the producers, because such suits were "necessary to ensure achievement of the Act's most fundamental objectives—to wit, the protection of the producers of milk and milk products." *Id.* 467 U.S. at 352, 104 S.Ct. at 2457. The consumer's interest in *Block*, conversely, was similar to the handlers, and therefore handlers could be expected to "challenge unlawful agency action and to ensure that the statute's objectives will not be frustrated." *Id.* Consumers suits served no independent purpose and were deemed precluded because they "would undermine the congressional preference for administrative remedies and provide a mechanism for disrupting administration of a congressional scheme." *Id.*

That proposition is even more true here, because the organizations seek review of the INS's actions (without the need to exhaust administrative remedies) in a different court under a somewhat different standard of review than that provided in IRCA. And the interests asserted by the organizations, even if they can be seen as somehow different from those of the aliens who seek legalization, are clearly so similar to those of the aliens that no statutory interest is left unprotected by recognizing Congress' implied preclusion of suits by QDEs or other organizations. Congress allowed individual aliens, who undoubtedly have the most direct interest in the administration of IRCA, to challenge unfavorable INS rulings only in the deportation context. It would undermine Congress' system of administrative remedies and its plan for limited judicial review of IRCA determinations, if QDEs were able to seek declaratory judgments in the district courts without any applicable exhaustion requirement.

### III.

The government alternatively argues that even if the district court had jurisdiction to entertain a suit challenging the INS regulation, it lacked jurisdiction to consider the narrower question presented in this appeal—whether the INS "policy" applied to section 265 cases was lawful—because the INS had not taken "final agency action" or the issue was not ripe for review. We go on to decide this question, thus resting our judgment on alternative holdings, because statutory exhaustion requirements (and the *Block* variation) as well as ripeness and finality are all jurisdictional or jurisdiction-related, and discussion of this latter issue further illustrates the inherent difficulties presented by direct district court review of a broad challenge to the INS policy under IRCA.

▮▮▮ In its brief, the government melds three related but distinct jurisdictional concepts. The INS conduct in this case is reviewable only if it constitutes "agency action," 5 U.S.C. § 551(13) (1982), that is "final," *id.* § 704, and otherwise "ripe" for review. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Each of these requirements is designed to maintain an appropriate relationship between federal courts and administrative agencies by preventing premature judicial intervention in the administrative process. "Agency action" includes "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13) (1982); *see FTC v. Standard Oil Co.,* 449 U.S. 232, 238 n. 7, 101 S.Ct. 488, 492 n. 7, 66 L.Ed.2d 416 (1980). Such action is not "final" within the meaning of section 704 of the APA, unless it represents a "definitive statement" of the agency's position. *Id.* at 241, 101 S.Ct. at 493; *USAA Fed. Savings Bank v. McLaughlin,* 849 F.2d 1505, 1508 (D.C.Cir.1988). Even "final agency action" is often unripe for review if a reviewing court is not presented with a concrete application of agency policy. The ripeness inquiry requires a court to balance "the fitness of issues for judicial decision against the hardship to parties of withholding" review. *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515. Determining "fitness," in turn, generally involves consideration of several factors: how "final" is the agency action; whether the issue raised is one of law that requires no further factual development, *compare Ciba–Geigy Corp. v. EPA,* 801 F.2d 430, 435 (D.C.Cir.1986) *with id.* at 443–44 (Silberman, J., dissenting); whether additional administrative consideration is needed to clarify the agency's position; and whether consideration of the issue would benefit from a more concrete setting. *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 940 (D.C. Cir.1986). The paradigm hardship against which the other side of the ripeness calculus is balanced has been described as " 'a dilemma for a private party who must choose between disadvantageous compliance and risking serious penalties.' " *Public Citizen Health Research Group v. Commissioner,* 740 F.2d 21, 31 (D.C.Cir. 1984) (quoting 4 K. DAVIS, ADMIN.L.TREATISE 369 (2d ed. 1983)).

We find the parties very much in disagreement as to whether the INS had actually formulated an agency policy that applied the "known to the Government" standard to section 265 cases after the INS acquiesced in the district court's interpretation of that phrase. Although the INS agreed to comply with the court's interpretation that "known to the Government" meant that a nonimmigrant qualified for legalization if he could show that the federal government as a whole had documentation that established his illegal status before 1982, the government claims it had not yet determined whether a nonimmigrant could establish that status by pointing to the *absence* of a document—the quarterly report—from the INS's files.

▮▮▮ In both the proposed intervenors' notice of points and authorities before the district court (adopted by appellees) and appellees' brief to this court, the counseling organizations claimed that INS Legalization Officers were refusing to accept applications from section 265 applicants, even after the district court's ruling of March 30

declaring the meaning of the term "Government." However, appellees conceded at oral argument—and our own review of the affidavits confirms—that, at most, *some* local INS offices were informing aliens that the office would *recommend* denial of applications based on the section 265 theory. Assuming a recommended denial by a regional INS office constitutes "agency action" under 5 U.S.C. § 551(13), it is clear that such a recommendation, let alone a prior indication that such a recommendation would be made, does not constitute *final* agency action. *See FTC v. Standard Oil Co.*, 449 U.S. at 241, 101 S.Ct. at 493. For all recommended denials are referred to an adjudicator, whose decision is subsequently reviewable by the Legalization Appeals Unit (LAU), 8 C.F.R. § 245a.2 (1988), and appellees do not allege that the LAU has ever decided a case involving the section 265 issue. That only some of the INS field offices were recommending denial of section 265 claims while others were not, moreover, shows that the INS had no clear internal policy on the issue. Review of a tentative administrative position expressed by only some regional INS offices would be "at odds with fundamental notions of administrative law that generally require the agency to resolve substantive issues in the first instance." *Public Citizen*, 740 F.2d at 31.

To be sure, the original INS "known to the Government" regulation appears to have precluded section 265 claims, because, as noted above, it enumerated only four circumstances in which an alien's unlawful statute would be deemed "known to the Government." *See supra* at 1327. But in their complaint, appellees never discussed the section 265 issue. Although they did vaguely allege that the INS regulation "restrict[ed] the statutory provision by enumerating the limited circumstances under which the INS is deemed to know of an alien's unlawful status," they offered no concrete case or legal theory for the district court to consider. Their only specific argument, so far as we can tell, was that "Government" must mean the entire federal Government and not merely the INS.

The focus of the proceeding was the definition of "Government," not the meaning of "known." Once the district court declared the regulation invalid insofar as it defined "Government" and enjoined the agency from applying it further, the court's retention of jurisdiction and continuing "supervision" of INS's administration of the program was not an appropriate exercise of judicial power vis-a-vis the government. *See Eastex, Inc. v. NLRB*, 437 U.S. 556, 568, 98 S.Ct. 2505, 2513, 57 L.Ed.2d 428 (1978) (once court decides the precise question raised, "[i]t is neither necessary nor appropriate ... to delineate precisely the boundaries" of the statutory provision). The INS should, at minimum, have been given the opportunity to reconsider the implications of the court's ruling for its IRCA legalization policy. *See Continental Air Lines v. CAB*, 522 F.2d 107, 125 (D.C.Cir. 1974) ("If the [agency's] position is likely to be abandoned or modified before it is actually put into effect, then its review ... interferes with the process by which the agency is attempting to reach a final decision.").

The dissent asserts that the district court "struck down" the entire regulation as if every word was illegal, but that is not, in our view, an accurate understanding of what occurred. The district court disputed a negative implication of the regulation: that an alien could *not* show that his illegal status was known to the government by any means *other* than the four circumstances recognized by the regulation. It was (and is) undisputed that an alien can qualify if his case falls within the scope of any of those four eventualities. There are, perhaps, an infinite number of factual patterns, other than those four, upon which an alien could rely to base a claim of "known to the Government." The district court, regardless of its sweeping language, decided only the legal issue argued before it— whether "known to the Government" was or was not limited to the INS's knowledge. The court did not thereby gain jurisdiction to decide whatever new variations could be presented on the "known to the Government" theme as if it were the administrator of the program. Since, as we have empha-

sized, the INS was not required to issue regulations which embodied its interpretation of the statute, it is particularly anomalous that the district court sought to extend its jurisdiction to encompass a claim as to another negative implication of the regulations that was not originally presented.

 Even had appellees raised the section 265 issue before the district court at the same time as it challenged the definition of "Government" (and pointed to the regulation as "final agency action"), an anticipatory ruling on the meaning of the word "known" without a clear indication of the government's own interpretation would not have been appropriate, because the issue would not then have been ripe for review. When determining whether an issue that brings into question the propriety of an agency interpretation of a statute it enforces is ripe, we must bear in mind other principles of administrative law. The INS had never taken a position on the particular question posed by section 265 claimants: Must an alien's unlawful status be proved by the *presence* of a document in an alien's file, or is the *absence* of a document (such as a section 265 quarterly report) adequate proof? The issue apparently was not raised before the agency during the rulemaking process, *see* 52 Fed. Reg. at 16,206, and neither appellees nor the INS was even *aware* of the section 265 theory until the proposed intervenors came on the scene in April. We see nothing in the statutory language or legislative history indicating that Congress ever considered the section 265 issue or the precise meaning of "known." *See Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). On its face, that statutory term certainly admits of multiple meanings, and even the district court commented on the inability of either party to "unearth any legislative materials which focus specifically and directly on the term 'unlawful status was known to the Government.'" *Ayuda*, 687 F.Supp. at 663 n. 16. It should thus be evident that Congress did not "directly address the precise question at issue," *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2781–82, and

therefore the judiciary must uphold an agency decision on the matter if it is "rational and consistent with the statute." *NLRB v. United Food & Commercial Workers*, 484 U.S. 112, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987).

 It follows, then, that when dealing with an ambiguous statutory term such as "known," a court should not interpose its own interpretation of the term *before* the agency has an opportunity to consider the issue and fix on its own statutory construction. It may well be that a court could properly conclude—faced with a concrete challenge—that Congress intended "known" to encompass something more than the four positive manifestations described in the regulation. But that conclusion surely does not necessarily carry with it a determination that knowledge could be imputed to the government based on an alien's failure to file a section 265 report. The agency should have been given an opportunity to answer that latter question before the court did. This is not a case where the agency has taken a clear position and then, in litigation, attempted to portray its policy as unsettled in order to render the dispute unripe. Rather, even though the INS regulations involved here might literally apply to section 265 claims, it is clear that the agency had never formulated its position on that issue. We thus are not faced with a facial challenge to an agency regulation that clearly commands a particular result on this issue. *Cf. Cablevision Systems Dev. Co. v. Motion Picture Ass'n*, 836 F.2d 599, 615 (D.C.Cir.), *cert. denied*, ── U.S. ──, 108 S.Ct. 2901, 101 L.Ed.2d 934 (1988) (although "strict adherance to the literal language" of letter by Copyright Office's General Counsel appeared contrary to law, case was unripe because the rulemaking from which the regulation grew never addressed the disputed issue, and there was "no showing of an interpretation to which the [agency] firmly adhere[d].").

 It has long been recognized that an agency has primary jurisdiction to apply the law to the facts on a matter arguably within its statutory authority.

*Far East Conf. v. United States,* 342 U.S. 570, 574–75, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952); *see also Nader v. Allegheny Airlines,* 426 U.S. 290, 304–05, 96 S.Ct. 1978, 1987–88, 48 L.Ed.2d 643 (1976). Although the doctrine of primary jurisdiction was originally rooted in the notion that agencies have greater expertise, experience, and flexibility than courts in dealing with regulatory matters, *see Far East Conf.,* 342 U.S. at 575, 72 S.Ct. at 494, as well as in a desire for uniform application of the law, *see id.,* we have recently held that abstention in favor of agencies charged with resolving conflicting statutory policies also promotes the proper relationships between courts and administrative agencies. *National Republican Cong. Comm. v. Legi-Tech Corp.,* 795 F.2d 190, 193 (D.C.Cir. 1986). This follows naturally from *Chevron,* which explained that deference to agencies was appropriate not only because of agency expertise but also because Congress is presumed to delegate the policy choices inherent in resolving statutory ambiguities to the agency charged with implementation of the statute. *Chevron,* 467 U.S. at 865–66, 104 S.Ct. at 2792–93; *Cablevision Systems Dev. Co.,* 836 F.2d at 608–09. To hold otherwise in this case would preclude the INS from adopting a different but permissible construction of the term "known," *cf. National Republican Cong. Comm.,* 795 F.2d at 194 n. 7, a result that would undermine the central tenet of *Chevron* and its progeny. *See Chevron,* 467 U.S. at 866, 104 S.Ct. at 2793 ("The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: 'Our Constitution vests such responsibilities in the political branches.'" (quoting *TVA v. Hill,* 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978))).

The dissent argues, however, that whatever the possible ambiguities of the term "known," it "unambiguously embraces" the claims of aliens who failed to file a section 265 quarterly report. Dissent at 1365. But the district court's order itself illustrates the error in the dissent's conclusion. Supplemental Order V recognized that not all aliens who failed to file the section 265 quarterly reports slipped into unlawful status; the failure to file must also have been *willful.* *Ayuda,* 687 F.Supp. at 668; *see* 8 U.S.C. § 1306(b) (1976), *amended by* 8 U.S.C. § 1306(b) (1982). Obviously, the statute contemplated that some failures to file would not be willful and thus not grounds for deportation—for example, failures caused by hospitalization or other unusual extenuating circumstances. We do not see how the government could, before 1982, make this willfulness determination based on documentation in its files. We are therefore confident that section 245A is at least ambiguous toward the legalization claims of aliens who merely failed to file section 265 reports prior to 1982.

Going even beyond the relief ordered by the district court, the dissent reads IRCA to require the INS to grant legalization to an alien whose only transgression was an inadvertent or excused failure to file a section 265 report. Dissent at 1366. This reading distorts the purposes of both section 265 and IRCA. Congress obviously did not mean to declare the status of such aliens unlawful, and provided a statutory mechanism for them to avoid deportation by establishing inadvertence or excuse. Nor did it seek to grant "amnesty" and permanent resident status to aliens who were here legally and could not have been deported. The dissent raises an issue about the meaning of yet another statutory phrase—"unlawful status"—and, at most, establishes one more ambiguity which should be resolved in the first instance by the INS.

Even assuming that failure to file a section 265 report did, in itself, establish unlawful status in all cases, the "known to the Government" provision is still ambiguous as applied to section 265 claims. The dissent argues that whatever the possible ambiguities of the term "known," Congress could not have meant to distinguish between methods of proving knowledge, such as the presence or absence of a document from a government file, and there is thus no need for agency consideration of the

issue. But the term "known" could have at least three separate meanings: (1) the Government *actually knew* about an alien's unlawful status; (2) the Government *should have known, i.e.,* the exercise of reasonable care would have led to actual knowledge; and (3) the Government *could have known, i.e.,* although the exercise of reasonable care alone would not have led to actual knowledge, extraordinary steps could have done so. While the presence of a document reporting an alien's illegal status would most likely result in actual knowledge of that fact by the agent of the government who receives and files the document, the mere absence of a quarterly report may well not lead to actual knowledge if all files are not monitored closely.

■ Even were we to agree, on first impression, that appellees' were correct that "known" included section 265 claims, we could not accept the proposed resolution because it would collapse the two discrete prongs of *Chevron* analysis into one. A court may construe an agency's organic legislation without regard to the agency's interpretation only when Congress has "directly addressed the precise question at issue." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781. This means that either the plain language of the statute must be clear, *see, e.g., Georgetown University Hospital v. Bowen,* 862 F.2d 323, 328 (D.C.Cir.1988), or the legislative history and design of the act must illustrate a specific intent despite arguably ambiguous statutory language. *See K Mart Corp. v. Cartier Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). Lacking one of these situations, a court must move to step two of *Chevron* and consider whether the agency has advanced a reasonable interpretation. Even if we were not able to envision an alternative construction to the one offered by appellees, we should hesitate before imposing our own. An agency may well perceive another meaning of ambiguous language which would not occur to a court that is less familiar with the intricacies of the particular regulatory field.

Be that as it may, we do not see how it can be contended at this stage that there is only one possible permissible construction of the phrase "known to the Government" in IRCA. Depending on the policies Congress had in mind when it enacted the statute, any of those definitions listed above could apply to section 245A of IRCA. Since there is no legislative history on the issue, we can only speculate from more general legislative history as to Congress' purpose.

As we earlier noted, the "known to the Government" requirement in IRCA seems odd. Only those illegal aliens whose identity and status are known—presumably the most notorious—are eligible for amnesty. Congressional concerns expressed in legislative reports accompanying IRCA reveal at least three possible reasons for this limitation on eligibility. One likely purpose was to protect against fraud in the legalization program by providing an easily administered bright-line rule. *See Ayuda,* 687 F.Supp. at 664. The legislative history also suggests, however, that an estoppel notion underlay the whole legalization program, because the large settlements of undocumented aliens were attributable to past failures of the government properly to enforce the immigration laws. *See* H.R. REP. No. 682, 99th Cong., 2d Sess., pt. 1, at 49 (1986). A third focus of Congress in IRCA was on the "illegal subclass now present in our society," which is characterized by a fear of imminent deportation, S.REP. No. 132, 99th Cong., 1st Sess. 16 (1985), and it might be thought that those aliens whose illegal status is actually known to the authorities are more likely to be part of the subclass. Although we need not and should not, of course, attempt to decide which of these concerns was dominant, suffice it for us to recognize that discerning Congress' policy objective—a task delegated to the INS—will impact on the choice among the different meanings of "known" listed above.

Juxtaposed against these compelling reasons for postponing judicial intervention is the alleged hardship to appellees if deprived of a rapid clarification of "known to the Government." Although the district court did not conduct a ripeness inquiry *per se,* it found that the plaintiffs would

suffer irreparable harm without an immediate ruling, because many qualified aliens would be deterred from applying for amnesty before the impending May 4, 1988 deadline. *Ayuda,* 687 F.Supp. at 665. The problem with this assertion—repeated by appellee organizations here—is that it confuses the parties who arguably have a cognizable injury redressable in district court with the parties who will suffer the alleged hardship. The *organizations* do not complain of a pressing hardship to themselves as counselors; they appear to be sliding into a representative capacity by invoking the interests of the aliens.

▆▆▆ The difficulties faced by individual aliens, even were they a proper focus of our analysis, would be of little importance in the ripeness equation. The risk to illegal aliens of coming forward to seek legalization is inherent in their position. *Cf. Hotel and Restaurant Employees Union v. Smith,* 846 F.2d at 1518 (opinion of Silberman, J.). Congress did, in IRCA, seek to alleviate somewhat an illegal alien's obvious difficulty in determining whether he or she qualified for legalization without revealing his or her identity by providing a mechanism whereby the alien could seek confidential advice from the QDEs. But the INS was not required to issue regulations or promulgate a policy on every possible legal theory supporting an amnesty claim, and the LAU does not issue advisory opinions. Even with advice from QDEs, some uncertainty on the part of prospective applicants is inevitable in an administrative program like this. A claimed hardship that results "not from delay in *enforcement* of an established standard, but from delay in *establishment* of a standard" is generally not a reason for prompt judicial action, *Public Citizen,* 740 F.2d at 31 (emphasis added), especially where Congress has not even required the INS to promulgate regulations defining the term "known."

\* \* \* \* \* \*

What the plaintiffs really sought from the district court was an advisory ruling on a potential theory for amnesty; with that opinion in hand, undocumented aliens could either come forward to receive their legalized status (if the theory were approved) or remain in hiding with their illegal status (if amnesty were unavailable). But the time pressures and risks to aliens involved in IRCA do not give a district court—any more than they would give a court of appeals—the power to preempt the administrative authority of the INS and direct the legalization program from the bench.

For the foregoing reasons, we conclude the district court lacked jurisdiction to issue Supplemental Order V and it is therefore

*Vacated.*

WALD, Chief Judge, dissenting:

I dissent from the majority's holding that the judicial review provisions of the Immigration Reform and Control Act of 1986 ("IRCA" or the "Act") deprive the district court of jurisdiction over the present action. I dissent as well from the majority's alternative refusal, on ripeness grounds, to entertain the appellees' challenge to the Immigration and Naturalization Service's ("INS") policy excluding from the IRCA legalization program nonimmigrant aliens whose unlawful status prior to 1982 stemmed from their failure to file quarterly reports with the INS as required by § 265 of the Immigration and Nationality Act ("INA"). Because I find neither of the majority's grounds a bar to jurisdiction, I also address the standing issue and find that the organizations that brought the present action have standing to do so. On the merits, I agree with the district court that the treatment of § 265 violators in 8 C.F.R. § 245a.1(d) was contrary to law.[1]

I. INTRODUCTION

In enacting IRCA, Congress sought not only to curtail illegal immigration but also to eliminate a subclass of undocumented aliens already living illegally within this

---

**1.** I do, however, disagree with the district court's decision on the merits in one respect.

*See infra* note 1355.

country's borders. The legalization program was designed to accomplish both goals. By legitimizing aliens already resident here for a number of years, Congress wanted to free up the scarce resources of the INS to focus on prevention of new illegal entrants. Legalization was also adopted to put an end to the anomaly of longtime alien residents' being indefinitely consigned to depressed wages and working conditions because of their weak bargaining position. Congress instituted a generous amnesty program to serve both ends; it affirmatively wanted the greatest number of eligible aliens to avail themselves of the Act.

Recognizing, however, that an alien deciding whether to apply for legalization would fear the risk of deportation if she is ultimately found ineligible, and that many underground aliens, suspicious of authority and not yet acclimated to our culture, might be deterred by that perceived risk, Congress took special pains to encourage illegal residents to step forward during the brief 12-month "window" period in which applications were to be filed. It knew that, if left unallayed, aliens' normal mistrust and suspicion would severely hamper the legalization program's effectiveness. Consequently, Congress set up a network of community organizations to provide each potential applicant with confidential advice about her chances of becoming legalized *before* the alien submits a formal application.

This court's ruling today ignores all of that background and motivation for the amnesty program; it also distorts the plain words of the Act. The majority concludes that a direct challenge to an INS regulation, brought in district court, is an action seeking "judicial review of a determination respecting an application for adjustment of status" and that district court jurisdiction is therefore barred by 8 U.S.C. § 1255a(f)(1), which provides that such review may take place only in a federal court of appeals and only in the context of the review of a deportation order. The majority reasons that an INS-promulgated regulation constitutes "a determination respect-

ing *an application*" because such rules "embod[y] determinations that will impact" future applications. Majority opinion ("Maj. op.,") *ante*, at 1331 (emphasis added). My colleagues speculate, without any support in the text or history of the Act, that Congress adopted such a restrictive review policy to assist the INS in fending off judicial interpretations of IRCA by permitting it to litigate the validity of its regulations in each circuit, even when that would result in a checkerboard of different eligibility policies being enforced in different parts of the country during the brief 12-month "window" period of eligibility. *Id.* at 1330–1332, 1334–1335. The majority ultimately concludes that INS regulations that illegally exclude entire categories of aliens from the legalization program cannot be challenged except through filings by individual aliens of applications certain to be rejected initially under the plain terms of the existing regulations. This runs afoul of Congress' documented intention that aliens be given as much accurate information as possible about their legalization prospects before deciding whether to submit applications. I find no basis for the majority's reading of IRCA.

Alternatively, the majority denies the availability of judicial review on the grounds of ripeness, concluding that the INS has not arrived at a final decision on the eligibility for legalization of nonimmigrant aliens whose unlawful status prior to 1982 stemmed from their failure to meet the INA § 265 requirement of filing quarterly reports with the INS. *Id.* at 1341–42, 1345–46. I find this holding to be totally at odds with the record in the case before us.

My reading of the text and legislative history is at one with the trial judge's: 8 U.S.C. § 1255a(f)(1)'s jurisdictional bar applies only to lawsuits that involve a court in reviewing (or undertaking for itself) the fact-finding and law-application functions that determine a specific individual's eligibility or ineligibility for legalization. While such a fact-specific lawsuit (whether filed before or after the filing of a legalization application) *would* seek "judicial review of a determination respecting an application,"

a suit such as the present one challenging the INS' rules on their face assuredly does *not* challenge such a "determination" and thus does not fall under IRCA's jurisdictional bar. Since 8 U.S.C. § 1255a(f)(1) does not preclude jurisdiction, the district court has its usual federal question jurisdiction to entertain a statutory or constitutional challenge to INS regulations. 28 U.S.C. § 1331(a) (federal question jurisdiction); 8 U.S.C. § 1329 (jurisdiction over "all cases arising under any of the provisions of this subchapter"); *see also* 5 U.S.C. § 701(a) (review available under the Administrative Procedure Act ("APA") unless statutes preclude judicial review or agency action is committed to agency discretion by law). This construction of IRCA is compelled not only by the language of § 1255a(f)(1) and of the subsections surrounding it but also by the background and purpose of the Act as a whole. Because Congress took special care to ensure that aliens would receive accurate advice from designated community organizations before having to decide whether to file an application, my colleagues' contention that Congress' purpose would best be served by permitting review of INS rules only in the context of individual deportation reviews long after the 12–month application period had lapsed is, to put it charitably, counterintuitive.

Similarly, the majority's position on ripeness is based on a faulty understanding of the procedural history of this case. The plaintiffs have challenged, from the outset, the INS' restrictive definition of "known" within the meaning of IRCA's requirement that an alien's pre–1982 unlawful status must have been "known to the Government." 8 U.S.C. § 1255a(a)(2)(B). The INS has had a formal policy on § 265 violators from the beginning, and it was embodied in a formal regulation that did constitute final agency action and was ripe for review.

I would also find that the organizations that brought the present lawsuit have standing to do so. The alleged injuries to them as organizations include not only "confusion" about how they should advise aliens, but also frustration of their mission of helping aliens to avail themselves of the benefits of legalization under IRCA. I consider this case controlled by *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), and its progeny in this court, all of which have found standing in similar situations.

On the merits, I would affirm the district court's ruling as to the inclusion of § 265 violators within the "known to the Government" category of aliens. A § 265 violator's unlawful status was "known to the Government" as of January 1, 1982, if the alien can show that his INS files do not contain the reports he was required to file under § 265. Each nonimmigrant alien had to inform the INS of any change of address, including a change of residence to a foreign country, and had to file a statement of his address for each three-month period in which he remained in the United States (even if his address were unchanged). Consequently, the INS must be deemed to have "known" of the alien's unlawful status if the alien's INS records are missing a quarterly report for a pre–1982 quarter and do not contain any record of the alien's having changed his address to another country. I therefore would affirm, in substantially all respects, the district court's Supplemental Order V.

## II. IRCA's Judicial Review Provisions

IRCA provides that "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section [governing applications for legalization] except in accordance with this subsection." 8 U.S.C. § 1255a(f)(1). The subsection authorizes the establishment of a single level of administrative appellate review of legalization applications, *id.* § 1255a(f)(3)(A), and provides that "[t]here shall be judicial review of such a denial [of adjustment of status] only in the judicial review of an order of deportation under [§ 106 of the INA]." *Id.* § 1255a(f)(4)(A). Section 106 of the INA provides that judicial review of deportation orders can take place only in U.S. Courts of Appeals after the alien has exhausted his administrative remedies. *See* 8 U.S.C. §§ 1255a(f)(4)(A), 1105a(a) (re-

view in courts of appeals); 8 U.S.C. §§ 1255a(f)(4)(A), 1105a(c) (exhaustion of remedies). These appellees obviously do not challenge any deportation orders; rather, they brought this action in district court to invalidate the INS rule excluding § 265 violators from the pool of aliens eligible for legalization. The crux of my disagreement with the majority is that I do not view the present action as seeking "judicial review of a determination respecting an application for adjustment of status" at all, and so I do not find it comes within the bar of § 1255a. That section on its face does not apply to this suit and was conceived for a different purpose altogether.

## A. *Language, Structure and Background of the Statute*

Either a rulemaking *is* "a determination respecting an application" or it is *not*. If, as I maintain, a rulemaking is *not*, in itself, "a determination respecting an application," then the jurisdiction preclusion provision of 8 U.S.C. § 1255a(f)(1) simply does not apply to this case; IRCA's bar to district court judicial review attaches only to "a determination respecting an application."

If, on the other hand, as the majority seems to say, Maj. op. at 1331, a rulemaking *is* "a determination respecting an application," then several anomalies are presented by the statutory scheme, none of which is adequately explained by the majority. First, there is the obvious linguistic difficulty in stretching the term "a determination respecting an application" to cover the promulgation of general rules. Second, interpreting "a determination respecting an application" to encompass rules compels the odd conclusion that the administrative appellate review board set up under IRCA actually has the power to entertain a facial attack on the validity of a regulation promulgated by the Attorney General. Third, the majority's reliance on the word "respecting" to explain the broad reach of "a determination respecting an application" is undermined by Congress' interchangeable use of that phrase with "the determination *on* the application." Against the back-

ground of a normal presumption in favor of reviewability of agency rulemaking, Congress' decision to preclude jurisdiction only over "a determination respecting an application" must be seen as a conscious decision not to preclude preenforcement review of rules.

I begin with the language of the allegedly exclusionary section itself. The words "application for adjustment of status" clearly describe a written document submitted by a particular alien applicant for a change of his status. Consistent with this view, other provisions of IRCA inform us that an "application[] for adjustment of status" is a concrete piece of paper that "may be filed" with various entities, 8 U.S.C. § 1255a(c)(1), may be "forward[ed]" by those entities to the Attorney General, *id.* § 1255a(c)(3), and must "contain" certain information. *Id.* § 1255a(a)(1)(C). The majority conveniently ignores this everyday meaning of "an application" by stressing instead the words surrounding it: "review of *a determination respecting an application.*" *Id.* § 1255a(f)(1) (emphasis added). To the ordinary reader, however, this phrase too appears to cover only the determinations that are made with respect to each application: rulings that go into an ultimate determination of whether a particular application is approved or disapproved. The majority, however, places the entire weight of its argument on the word "respecting," which it interprets to encompass anything having any relation to or impact on any legalization applications present or future. I find that reading overbroad and misguided; the context of the phrase "respecting an application" conveys an altogether different meaning: *i.e.,* that a review of any aspect of an individual's application must be channeled through the deportation proceeding. Note that Congress did not say that "any *claim arising under* the legalization program," nor that "any *action taken or decision made* with respect to the legalization program" must be so channeled. Rather, the preclusion provision of § 1255a(f) is addressed only to "a *determination* respecting an *application.*" 8 U.S.C. § 1255a(f)(1) (emphasis added).

The entire subsection dealing with administrative and judicial review, of which § 1255a(f)(1) is a part, makes clear that Congress used the phrase "a determination respecting an application" as a catch-all for any and all aspects of an individual's petition—*i.e.*, ascertaining the facts of the individual's case and applying the law to those facts. The Act requires the Attorney General to establish "a single level of administrative appellate review of *a determination described in paragraph (1).*" § 1255a(f)(3)(A) (emphasis added). Such review shall be based solely "upon the administrative record established at the time of *the determination on the application*" and upon newly-discovered evidence that was unavailable "at the time of *the determination.*" § 1255a(f)(3)(B) (emphasis added).

None of these provisions dealing with administrative appellate review makes sense if, as the majority insists, the promulgation of a general rule concerning eligibility for legalization is also construed as a "determination described in" § 1255a(f)(1). *See* Maj. op., *ante*, at 1332. Certainly Congress did not envision that the Legalization Appeals Unit of the INS (the "LAU") would undertake administrative review of the Attorney General's regulations. Yet that must follow if a regulation is "a determination described in" § 1255a(f)(1), as the majority insists it is. The majority contends that there is nothing odd or unusual about administrative review of rulemaking, nor about a requirement that a challenge to a rule be *raised* first before the LAU; they argue that, while the LAU probably would be bound by the Attorney General's regulations, the LAU would be free to *interpret*

the regulations in such a way as to avoid any conflict with the statute. Maj. op., *ante*, at 1332. Even if that were true (I remain skeptical), other consequences of the majority's position are more ominous. If, for instance, the majority's view is correct, then § 1255a(f)(3) does not merely authorize aliens whose applications have been denied to *raise* a challenge to a rule before the LAU and receive a saving *interpretation* of that rule. The majority's reading of "a determination respecting an application" compels a far stranger result: the issuance of the rule itself would be "a determination," and the LAU would be empowered to conduct "administrative appellate review of [that] determination"—that is, appellate review of the rule's facial validity. 8 U.S.C. § 1255a(f)(3)(A). In short, if the majority wants to stretch the term "a determination respecting an application" to bar district court jurisdiction over the present case, it must explain the absurd consequence of empowering an administrative appellate review board to strike down the Attorney General's regulations.

The majority denies that its reading of the Act would empower the LAU to entertain a *facial* challenge to a regulation, because the LAU can only hear cases involving challenges to the INS' disposition of individual legalization applications. Maj. op., *ante*, at 1332 n. 7. The majority grounds this argument on the premise that Congress attached entirely different meanings to the § 1255a(f)(1) phrase "a determination *respecting* an application" and the § 1255a(f)(3)(B) phrase "the determination *on* the application." 8 U.S.C. § 1255a(f) (emphasis added). Yet subsection (f)(3) clearly uses the two terms interchangeably.[2] Either both terms encompass rule-

**2.** A reading of 8 U.S.C. § 1255a(f)(3) illustrates Congress' interchangeable use of the two terms. Paragraph (3)(A) establishes administrative appellate review of "a determination described in paragraph (1)," which is the paragraph containing the term "a determination *respecting* an application for adjustment of status." *Id.* § 1255a(f)(3)(A), (f)(1) (emphasis added). Paragraph (3)(B) states that "[*s*]uch administrative appellate review"—signalling by the word "such" that the review is of a "determination *respecting* an application"—shall be based on the administrative record "established at the time of the determination *on* the application."

*Id.* § 1255a(f)(3)(B) (emphasis added). In short, Congress provided for review of a determination "respecting" an application, based on the record established at the time of the determination "on" the application.

The majority contends that the words "respecting" and "on" signal that the statute is referring to *different determinations*. Thus, the majority argues, paragraph (f)(3)(A) establishes administrative appellate review of rulemaking and adjudication alike, while under paragraph (f)(3)(B) such review can take place only after an adjudication. Maj. op., *ante*, at 1332 n. 6,

making as well as adjudication—in which case the majority's strained reading of IRCA results in the LAU being given the power to entertain facial challenges to regulations—or neither term encompasses rulemaking within its scope—in which case the preclusion provision of 8 U.S.C. § 1255a(f)(1) is no bar to district court jurisdiction over the present case. The majority cannot have it both ways.

On the basis of an all-embracing definition of the word "respecting," my colleagues wipe away the general presumption of reviewability of agency rulemaking. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 139–41, 87 S.Ct. 1507, 1510–11, 18 L.Ed.2d 681 (1967) (preenforcement review of regulations is available, so long as ripeness standards are met, unless "there is persuasive reason to believe" Congress intended to cut off review); *National Treasury Employees Union v. Devine*, 733 F.2d 114, 117 n. 8 (D.C.Cir.1984) (rejecting suggestion "that a detailed scheme of administrative adjudication impliedly precludes preenforcement judicial review of rules"). Yet Congress gave no indication it envisioned any such drastic curtailment here, although it knows well how to excise normal review procedures when it puts its mind to it. Thus, for example, where Congress intended to foreclose review of all rulemakings and adjudications of the Veterans' Administration, it provided that "the decisions of the Administrator *on any question of law or fact under any law*

administered by the Veterans' Administration providing benefits* for veterans and their dependents or survivors" would be immune to review. 38 U.S.C. § 211(a) (emphasis added). That kind of preclusion clause obviously would apply to, *inter alia,* suits alleging that V.A. regulations were based on an impermissible interpretation of a benefits statute. *See Traynor v. Turnage*, 485 U.S. 535, 108 S.Ct. 1372, 1379–80, 99 L.Ed.2d 618 (1988).[3] In IRCA, by contrast, Congress did not apply its exclusive review procedure to any "decision of the Attorney General on any question of law or fact under IRCA," but only to "a determination respecting an application for adjustment of status."

The location of the judicial review provision within the structure of the Act also bolsters a more limited interpretation of § 1255a(f)(1)'s intended effect. It follows immediately after several subsections dealing with adjudication of applications; the general rulemaking authority under which the challenged INS regulation was promulgated appears in the following subsection, which has no review provisions in it. 8 U.S.C. § 1255a(g). Were the structure otherwise—with the limits on judicial review following the sections authorizing adjudications and rulemaking—the majority's reading of the Act would be more plausible. But the actual sequence strongly suggests that only review of individual applications, not rulemaking, is limited by § 1255a(f).[4]

---

1332 n. 7. Yet a common-sense reading of (f)(3)(A) and (f)(3)(B) together indicates that the (B) term refers to the *same determination* as the (A) term does. This reading is underscored by the use of the definite article in the second reference: *"the* determination on *the* application." *Id.* (emphasis added). The juxtaposition of the two phrases, coupled with the use of the word "the" to indicate that the same determination and the same application are being referred to, compel the conclusion that Congress saw no difference between a determination "respecting" an application and a determination "on" an application: neither phrase encompasses rulemaking.

**3.** The Supreme Court there held that the preclusion was inapplicable to the declaratory judgment action in *Traynor v. Turnage* not because the action challenged regulations, but because it challenged those regulations as being inconsist-

ent with a federal statute other than a "law administered by the Veterans' Administration providing benefits." 108 S.Ct. at 1379–80.

**4.** The majority argues that permitting a district court to review an INS rulemaking would circumvent § 1255a(f)(4)(B)'s scope-of-review provision. A court of appeals reviewing a legalization denial in the course of deportation order review must apply an "abuse of discretion" standard of review to the "determinations contained in [the administrative] record," *id.;* the majority fears that district court review of rulemaking would permit an end run around that restrictive standard. But this argument relies on what even the majority admits is a slender distinction—the difference between the "abuse of discretion" standard and the standard enunciated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)—*i.e.,* that an agency's inter-

### B. *Legislative History and Statutory Purpose*

Certainly the ordinary meaning of the text does not permit a conclusion that INS regulations are immunized from the normal avenues of challenge in district court. Furthermore, IRCA's legislative history contains no evidence at all that this is so: quite the contrary.

The majority spends little time on the Act's legislative history. Instead, it propounds a circular argument. It assumes (not proves) that Congress intended to preclude district court jurisdiction over this case, and comes up with a packet of its own reasons why. Then, it goes on to conclude stunningly that this court cannot flout the will of Congress by holding otherwise. *See* Maj. op., *ante*, at 1330–32, 1334–35.

Thus my colleagues argue that an action seeking a speedy judicial determination of the validity of an INS rule would defeat Congress' imputed intent to have such determinations made piecemeal, by different circuit courts of appeals, in challenges to deportation orders. *See* Maj. op., *ante*, at 1330–32. Congress—they say—must not have cared about intercircuit splits and even intracircuit nonacquiescence despite its attendant legal uncertainties and non-

uniform practices for the acknowledged "long time" before the Supreme Court eventually settled key questions about eligibility standards. *Id.* at 1330–31 n. 4, 1334–35. According to the majority, Congress was content to let the INS pursue its chosen policies in as many jurisdictions as possible for as long as possible despite contrary judicial rulings. The problem with this ingenious interpretation of Congress' intent is that the majority can point to absolutely no evidence whatsoever that Congress in fact valued nonuniformity, uncertainty and slowness in getting major legalization questions settled. The majority merely infers that intent from the fact that those consequences would follow *if § 1255a(f) were construed as precluding district court jurisdiction over this action.* The majority's "evidence" of congressional intent on this issue is nothing but a creature of its own conjuring.[5]

### 1. Congress' Adoption of the House Provision on Judicial Review

The majority proffers only one argument based on IRCA's legislative history. My colleagues say that, since the Senate conferees abandoned a strict Senate provision precluding all judicial review of all aspects

---

pretation of ambiguous statutory language must be upheld unless it is unreasonable or manifestly contrary to the statutory purpose. The majority acknowledges that it "may well be" that the two standards "would not differ markedly." Maj. op., *ante*, at 1329–30 n. 2.

To the extent that the abuse of discretion standard is more deferential than *Chevron,* it would be unprecedented to apply such a super-deferential standard to the question of whether an agency's regulations comport with its statutory mandate. *Cf.* 2 S. Childress & M. Davis, *Standards of Review* § 17.2 at 335–36 (1986) (citing *Chevron* as representing the most deferential end of the spectrum in review of agency statutory interpretation); 2 C. Koch, *Administrative Law and Practice* § 9.13 at supp. 40 (1985 & Supp.1987) (agency rules that fill in gaps left in legislation merit "rather strict judicial scrutiny even though it is sometimes identified as discretion"). Nor has the majority offered any example of abuse-of-discretion review of agency rulemaking. I therefore think it unlikely that INS regulations are among the "determinations contained in [the administrative] record" to which the abuse of discretion standard applies. 8 U.S.C. § 1255a(f)(4)(B).

**5.** The majority infers that Congress intended rulemaking review to go court-by-court because "it placed review of agency action in the courts of appeals." Maj. op., *ante*, at 1334. It is, of course, uncontested that review of agency *adjudication* was placed exclusively in the courts of appeals, because the Act incontestably says so. On the other hand, whether the same statutory language applies to all "agency action," including *rulemaking*, is distinctly not clear from the text. Moreover, the interests of certainty and uniformity apply with much greater force to review of rules than to review of adjudications. The INS regulations were required to be publicized widely, and they are broadly applicable to large categories of aliens. As is discussed, *infra*, Congress also established a network of community service agencies to advise aliens about the rules and about their individual chances of legalization. From the fact that Congress was willing to tolerate circuit splits on the narrow, fact-specific questions arising in adjudications, it should not be inferred absent statutory text or legislative history to support such an inference that Congress also intended the same uncertainty to dog the validity of the eligibility criteria themselves.

of the legalization program and acceded to the House provision allowing a narrowly-channeled judicial review procedure for adjudications, it is unlikely that the Senators meant to permit independent district court review of rulemaking as well. *See* Maj. op., *ante*, at 1334–35. The rejected Senate version would have precluded review of any "decision or determination under this section." S. 1200, 99th Cong., 1st Sess. § 202(f)(1) (1985). Since "this section" in that bill included a provision authorizing the Attorney General to promulgate regulations necessary for the legalization program, *id.* § 202(g)(1), the Senate restriction would clearly have precluded review of rulemaking as well as adjudication.[6] That scenario suggests, however, quite a different conclusion from the panel's: when the Senate agreed to House language which, on its face, limited only the judicial review procedure for determinations respecting applications, it must be assumed to have known that it was receding from a broadly worded preclusion to a much narrower one, and to have consciously made that choice. This bit of history in fact adds to the credibility of my interpretation that § 1255a(f)(1) bars judicial review outside of deportation proceedings only of determinations about specific legalization applications.[7]

Indeed, there is further evidence that the Senate understood the term "determination respecting an application for adjustment of status" to mean an adjudication. The Senate bill had also limited applicants to a single level of administrative appellate review "of a final determination respecting an application for adjustment of status." S. 1200, *supra*, § 202(f)(4). Like the House version ultimately adopted, such review would be based solely upon "the administrative record established at the time of the determination on the application." *Id.* That Senate bill provision, however, was in addition to the one earlier discussed, in the same bill, which precluded review of any "decision or determination under this section." *Id.* § 202(f)(1). Thus, when the Senate dropped its comprehensive preclusion and agreed to retain only the more limited one involving "determination[s] respecting an application," it must surely have known that the abandonment would have some effect—*i.e.*, ordinary agency rulemaking review would continue outside of the adjudication format.

2. Purpose of the Judicial Review Provisions

The majority misreads IRCA's legislative history in two basic ways. First, it concludes, surprisingly, that Congress' purpose in providing so narrow a channel for

---

**6.** The Senate report accompanying S. 1200 lends support to this view, by stating that the preclusion attaches to "a decision or determination made with respect to *the legalization program.*" S.Rep. No. 132, 99th Cong., 1st Sess. 48 (1985) (emphasis added).

**7.** In its competing scenario, the majority treats as crucial a statement made by Senator Cranston during a 1983 floor debate over an immigration reform bill that ultimately was fatally stalled in conference in the 98th Congress. *See* Maj. op., *ante*, at 1334–35. Senator Cranston advocated a judicial review amendment to the bill then under discussion, S. 529; his amendment would have "merely permit[ted]" a "very limited form of judicial review" that "would [have been] available only when an *improper* denial of legalization is raised as a defense in a deportation proceeding already subject to judicial review." 129 Cong.Rec. 12,810 (1983); *see* Maj. op., *ante,* at 1335. Contrary to the impression conveyed by the majority's reference to it, Senator Cranston's amendment differed significantly from the provision ultimately enacted by

the 99th Congress. His amendment carved out one exception to a draft provision that precluded review of any "decision or determination made by the Attorney General under this section"; since "this section" included rulemaking authority, preenforcement review of rules was excluded. S. 529, 98th Cong., 1st Sess., § 301(g)(1), (f) (1983) (as reported). While carving out a single exception for deportation proceedings, Senator Cranston's proposed amendment would have left § 301(g)(1) otherwise intact, which explains why his remarks assumed the unavailability of preenforcement review of rules. *See* 129 Cong.Rec. 12,810 (text of proposed amendment). By contrast, the conference committee compromise that was ultimately enacted into law in 1986 (fully three years after Senator Cranston's remarks) *changed the wording of the preclusion provision:* the Senate dropped its broadly worded version precluding review of any "decision or determination under this section" and acceded to the House version containing the "determination respecting an application" language now at issue.

judicial review was to afford the INS more leeway in fending off adverse decisions by the federal judiciary, presumably even at the expense of substantial delays and disruption of the operation of the legalization program. *See* Maj. op., *ante*, at 1330–32, 1334–35. I find that interpretation of Congress' purpose most extraordinary. My reading suggests the opposite, that Congress' primary reason for limiting judicial review of adjudications was to *prevent* delays and uncertainty. The Senate report explained that purpose as follows:

> The Committee is concerned that efforts will be made, on behalf of many persons who are ineligible for the legalization program, to *delay* the final determinations of their applications. This would prevent not only their own deportation but *the expeditious operation of the program for others.*
>
> It is for the purpose of helping to insure *reasonably prompt final determinations* that subsection (f) provides that there will be no judicial review of a decision or determination made with respect to the legalization program.

S.Rep. No. 132, 99th Cong., 1st Sess. 48 (1985) (emphasis added). As noted above, IRCA as enacted retreated from the total review preclusion of the Senate version. The Senate report does, however, illustrate the true underlying purpose for Congress' decision to restrict judicial review.

The language and legislative history of IRCA indicate that what Congress really intended by the preclusion section was to foreclose aliens from flooding the courts with suits seeking premature review of individual applications—*i.e.,* review of the INS' determination of the facts of each case and its application of the law to those facts before deportation hearings were concluded. Congress legislated against a background in which individual aliens were often permitted to bring actions in district court—long before the start of deportation proceedings—seeking declaratory or injunctive relief to redress the INS' disposition of their various applications and petitions under the immigration laws. *See, e.g., Navarro v. District Director,* 574 F.2d 379, 383 (7th Cir.) (review of denial of ad-

justment of status), *cert. denied,* 439 U.S. 861, 99 S.Ct. 182, 58 L.Ed.2d 170 (1978); *Acupuncture Center of Washington v. Dunlop,* 543 F.2d 852 (D.C.Cir.) (review of denial of labor certification), *cert. denied,* 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976). In enacting IRCA's provision barring pre-deportation-order review of "a determination respecting an application for adjustment of status under this section," 8 U.S.C. § 1255a(f)(1), Congress obviously decided to create, for the IRCA legalization program, a narrow channel for judicial review of the INS' factfinding and law-application functions. The exercise of jurisdiction over this case is in no way inconsistent with that goal.

While partial insulation of the INS' adjudication actions from scattershot judicial review was a logical means to the end of finality, speed, and the smooth operation of the system, *cf.* Maj. op., *ante,* at 1330–32, 1334–35, it is intuitively implausible to attribute to Congress a conscious desire to spur the INS on to fight any major rule challenge to the bitter end in each of a dozen circuits. The best evidence of what Congress did want goes in exactly the opposite direction. *See Traynor v. Turnage,* 485 U.S. 535, 108 S.Ct. 1372, 1379, 99 L.Ed.2d 618 (1988) (finding no bar to judicial review of certain decisions of the Veterans' Administration, noting that "[p]ermitting these cases to go forward will not undermine the purposes of" the review-preclusion provision). As the majority itself acknowledges, a suit such as this one directly challenging INS rules is by far the superior vehicle to achieve a swift and decisive resolution of the law nationwide without the need for ultimate settlements of intercircuit conflict by the Supreme Court itself, followed by reopening of thousands of appeals in the courts whose views are rejected. Maj. op., *ante,* at 1330–32. My interpretation of § 1255a(f) as allowing direct review of rules, coupled with limited judicial review of individual adjudications, is the most consistent method of accomplishing what Congress clearly intended.

3. Purpose of the Legalization Program Generally

The majority also fails to consider the judicial review provisions in the context of

the entire legalization scheme. It reduces the legalization program to merely "part of a legislative compromise" necessary to engineer passage of the statute's main goal of penalizing employers who hire illegal aliens. *Id.* at 1326. Thus—the majority argues—Congress would not likely have worried about an individual alien's fear that coming forward in order to challenge an invalid INS rule denying him eligibility would entail a risk of deportation. *See id.* at 1345–46.

My colleagues' dismissal of the legalization component of the bill is inaccurate, as a careful reading of the history will show. Congress saw legalization as one of the central components of immigration reform. *See* H.R.Rep. No. 682, pt. 1, 99th Cong., 2d Sess. 49 (1986), U.S.Code Cong. & Admin. News 1986, p. 5653 (legalization is "an essential part of any immigration reform legislation"). Legalization had always been a critical feature (along with employer sanctions and improved border control) of immigration reform proposals advanced by the Ford, Carter and Reagan administrations and debated by Congress for over a decade. *See* S.Rep. No. 132, 99th Cong., 1st Sess. 20–24 (1985); H.R.Rep. No. 682, pt. 1, *supra,* at 53–56; *see also id.* at 103 (employer sanctions and legalization are the "core elements" of the Reagan administration program) (quoting Attorney General Edwin Meese, III). Legalization was motivated in part by the belief that long-standing resident aliens deserved it,[8] but there were more pragmatic concerns as well. First, legalization would enable the INS to focus its resources on the illegal entry of new aliens, thereby giving the United States more "enforcement for its dollar." S.Rep. No. 132, *supra,* at 16; *see* H.R.Rep. No. 682, pt. 1, *supra,* at 49. Second, legalization would "eliminate the illegal subclass now present in our society," whose members' weak bargaining position (stemming from their illegal status) was eroding U.S. wages and working conditions. S.Rep. No. 132, *supra,* at 16; *see* H.R.Rep. No. 682, pt. 1, *supra,* at 49. To be effective in those goals, however, the legalization program

had to attract a large majority of the approximately one million illegal aliens estimated to be eligible. *See* S.Rep. No. 132, *supra,* at 64 (estimate based on proposed 1980 cutoff date, rather than 1982 date adopted in IRCA). To this end, Congress intended a "generous program" that would be "implemented in a liberal and generous fashion" to "ensure true resolution of the problem and ... ensure that the program [would] be a one-time-only program." H.R. Rep. No. 682, pt. 1, *supra,* at 49, 72, U.S. Code Cong. & Admin.News 1986, pp. 5653, 5676.

Congress naturally recognized that illegal aliens would initially be suspicious of any amnesty program. A plethora of witnesses told them so, if they had not known it already. *See, e.g., Immigration Reform and Control Act: Hearings on H.R. 1510 Before the Subcomm. on Immigration, Refugees and International Law of the House Comm. on the Judiciary,* 98th Cong., 1st Sess. 783, 789 (1983) (statement of Dale DeHaan, American Council for Voluntary Agencies); *id.* at 844–45, 855–56 (statement of John Huerta, Mexican American Legal Defense and Education Fund). Because failure to apply on the part of a significant number of aliens could defeat a major purpose of the bill, Congress took special steps to encourage apprehensive aliens to come out of the shadows and apply for an adjustment of status. It required the Attorney General to widely disseminate information about the legalization program and the requirements for obtaining adjustment of status. 8 U.S.C. § 1255a(i); H.R.Conf.Rep. No. 1000, 99th Cong., 2d Sess. 93 (1986). Congress also told the Attorney General to name as "qualified designated entities" ("QDEs") community organizations with whom the aliens had friendly relations to advise and assist them in the preparation of applications. *Id.* § 1255a(c)(2). A QDE could forward an application to the Attorney General only if authorized by the applicant to do so, *id.* § 1255a(c)(3), and even more important, the Attorney General and the INS could not obtain access to any alien's QDE

---

**8.** *See, e.g.,* H.R.Rep. No. 682, pt. 1, *supra,* at 49.

file without that alien's consent. *Id.* § 1255a(c)(4). The QDEs were to be honest counselors for suspicious aliens. If an alien seeking their help found she was not eligible, she would not automatically be reported to the INS.

Congress fashioned such unusual measures in response to legislators' expressed concern about a "low rate of participation among the eligible candidates."

> At least part of the reason is distrust of authority and lack of understanding among the undocumented population. The Committee hopes that by working through the voluntary agencies, the Attorney General might be able to encourage participation among undocumented aliens who fear coming forward.... The confidentiality of the records [of QDEs] is meant to assure applicants that the legalization process is serious, and not a ruse to invite undocumented aliens to come forward only to be snared by the INS.

H.R.Rep. No. 682, pt. 1, *supra,* at 73. *See also* S.Rep. No. 312, *supra,* at 47, U.S.Code Cong. & Admin.News 1986, p. 5677 (QDEs provision aims "to assure applicants that they may apply to such entities without fearing that their applications will be forwarded to the INS even if in the view of such entities they do not qualify for legalization"). Senator Simpson, IRCA's main sponsor in the Senate, acknowledged that the program could work only if it were widely publicized in such a way as to overcome aliens' natural distrust. In a speech on the Senate floor urging the adoption of the Conference version, he stated:

> So when they legalize they will have to know, as that call goes out, that this legalization period is existent, that they must come forward because this is the last call. This is the first call, and the last call, a one-shot deal. Come on out. Go to your church. We are not trying to fool you this time.

132 Cong.Rec. S16888 (daily ed. Oct. 17, 1986).

Congress then provided for a one-time-only legalization program with a 12–month "window" period for filing applications.

For the program to work, literally hundreds of thousands of aliens had to be induced to come forward and find out if they were eligible during that brief period. They had to be given the correct information about legalization requirements if the maximum number were to apply. By providing for a network of QDEs, Congress meant to permit aliens unsure of their status to step forward *tentatively,* obtain accurate and confidential advice about legalization, and *only then* decide whether to submit an application to the INS.

In light of this carefully crafted scheme, the majority's tortured reading of 8 U.S.C. § 1255a(f)(1) to deny any avenue for challenging INS rules restricting eligibility except through individual aliens' applications is untenable. An illegal alien told that he is ineligible under INS regulations must decide which regulations may be unauthorized and step forward to submit his application anyway and become a test-case. And not just one such courageous act would be required; all aliens wishing to avail themselves of the benefits of a ruling against the regulation must submit applications to the INS. They would not be allowed to wait on the sidelines until the first test case came to closure since the window period was only 12 months long and judicial review of the first wave of applications would almost certainly not take place until long after the 12–month period had lapsed. Although the majority dismisses the aliens' understandable fear of the INS as being "inherent in their position," Maj. op., *ante,* at 1346, the fact is that Congress made one of IRCA's chief purposes the diminution of that fear. A Congress expressly desirous of seeing that aliens are accurately advised of their eligibility for legalization would hardly choose the course the majority stakes out. Certainly it is presumptuous to impute to that Congress such a scheme, as the majority does, when it runs counter to all the signals Congress actually sent, yields a harvest of distrust and subverts the major goals of the Act. It makes infinitely more sense to assume that in the absence of any specific bar, Congress meant to keep in place the ordinary avenues of direct review for eligibility regula-

tions so that egregious misinterpretations could be quickly corrected for all aliens in all jurisdictions before the 12–month period for applications ran out. That intent was at the base of the district court's restricted interpretation of § 1255a(f)(1), and I agree with it.

### C. *Prior Cases*

The majority's flamboyant reading of § 1255a(f) is also out of step with the rulings of other federal courts. It is at odds with three sister circuits' interpretation of § 106 of the INA, which governs review of deportation orders. IRCA's judicial review provision for denials of legalization applications requires that such review take place only in the course of § 106 deportation proceedings. Section 106, in turn, has its own "sole and exclusive procedure for [ ] the judicial review of all final orders of deportation," 8 U.S.C. § 1105a(a), and "[a]n order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him." *Id.* § 1105a(c). Notwithstanding that language, three circuit courts have held that challenges to official INS policy—whether in the form of regulations or of an officially approved program, pattern or scheme followed by immigration officials and approved by those in charge—can be directly attacked in a district court proceeding brought against the agency. *See Salehi v. District Director,* 796 F.2d 1286, 1290 (10th Cir.1986) (challenge to validity of regulations and to the INS' application of them in denying plaintiffs' applications for asylum); *Jean v. Nelson,* 727 F.2d 957, 979–81 (11th Cir.1984) (en banc) (challenge to an INS policy of detaining aliens pending disposition of their petitions for asylum, as being discriminatory and as having been adopted without notice and comment), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) (expressing no view on jurisdictional issues); *Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1033 (5th Cir.1982) (challenge to an alleged INS program of unlawfully discriminatory treatment of Haitians' petitions for asylum). Four district courts have already extended the logic of those cases to

the judicial review provisions of IRCA. *See Doe v. Nelson,* 703 F.Supp. 713, 720–22 (N.D.Ill.1988); *Immigration Assistance Project v. INS,* No. C88–379R, slip op. at 10–11 (W.D. Wash. Nov. 2, 1988); *Haitian Refugee Center v. Nelson,* 694 F.Supp. 864, 873–74 (S.D.Fla.1988); *Zambrano v. INS,* No. S–88–455, slip op. at 6–7 (E.D.Cal. Aug. 9, 1988).

The majority evidently believes that these courts have all misinterpreted § 106 of the INA and § 1255a of IRCA, and cites other cases in support of its restrictive approach to both sections: *Foti v. INS,* 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963), and *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). In *Foti,* an alien appearing at a deportation hearing conceded his deportability and requested discretionary relief, in the form of a suspension of deportation, which was denied. He was granted the right to voluntary departure at his own expense, but that grant was coupled with a contingent deportation order directing that he be deported if he failed to depart voluntarily within the prescribed time. 375 U.S. at 219 n. 1, 84 S.Ct. at 308 n. 1. The Court held that review of a denial of suspension of deportation fell within the court of appeals' exclusive jurisdiction under § 106, since the statutory term "final orders of deportation" included "all determinations made during and incident to the administrative proceeding conducted by a special inquiry office and reviewable together by the Board of Immigration Appeals." *Id.* at 229, 84 S.Ct. at 313. In *Chadha,* an alien was granted a suspension of deportation but the House of Representatives vetoed the suspension; the alien was then ordered deported. The Court held that the alien's constitutional challenge to the statute authorizing the one-house veto fell within the jurisdiction of the court of appeals under § 106. The Court held that "the term 'final orders' in § 106(a) 'includes all matters on which the validity of the final order is contingent, rather than only those determinations actually made at the hearing.'" 462 U.S. at 937–38, 103 S.Ct. at 2777 (quoting *INS v. Chadha,* 634 F.2d 408, 423 (9th Cir.1980)).

In both *Foti* and *Chadha,* the alien seeking court of appeals review was subject to an outstanding final order of deportation. *Foti,* 375 U.S. at 219 n. 1, 84 S.Ct. at 308 n. 1; *Chadha,* 462 U.S. at 928, 103 S.Ct. at 2772. Thus, both were primarily seeking "judicial review of [a] final order[ ] of deportation." 8 U.S.C. § 1105a(a). The Supreme Court predictably held that an alien *who is subject to a final order of deportation* can challenge all matters on which the validity *of that final order* is contingent in his appeal of the order under § 106; those other matters are "included" or "encompassed" within the term "final order[ ]." This is quite different, however, from a holding that under no circumstances can the legality, or presumably even the constitutionality, of INS regulations or policies be directly challenged outside the § 106 procedure. The Supreme Court did not intimate any view in either *Foti* or *Chadha* as to whether the exclusivity feature of § 106 attaches not only to the actual deportation process itself, but also to matters which the individual might conceivably raise in such a deportation proceeding. The circuits are presently divided on the issue; ours has not yet chosen sides. *Compare Jaa v. INS,* 779 F.2d 569, 571 (9th Cir.1986) (denial of application for adjustment of status reviewable in district court) *with Kashani v. Nelson,* 793 F.2d 818, 826–27 (7th Cir.) (denial of application for asylum not reviewable in district court but must be renewed in deportation proceeding), *cert. denied,* 479 U.S. 1006, 107 S.Ct. 644, 93 L.Ed.2d 701 (1986). *Compare Hotel & Restaurant Employees Union Local 25 v. Smith,* 846 F.2d 1499, 1506 (D.C. Cir.1988) (en banc) (equally divided court) (exhaustion requirement of § 106 does not apply to "general challenge to the INS' entire framework for processing [asylum] applications") (opinion of Mikva, J.) *with id.* at 1518–19 (stating, without deciding, that "it is likely that a denial of asylum is appealable under the APA") (opinion of Silberman, J.). In short, this court has not yet decided whether an individual alien could bring a direct, district court challenge to a denial of asylum or denial of adjustment of status; moreover, there is no precedent in any circuit for the proposition that § 106 bars a suit challenging a regulation or agency-wide practice on statutory or constitutional grounds, and at least one case goes the other way. In sum, none of the panel's § 106 case citations offers any meaningful support for my colleagues' interpretation of § 1255a(f)(1).

The majority also analogizes this case to *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), involving appeals under the Medicare Act. In that case, plaintiff Ringer sued in district court for a declaratory judgment invalidating a ruling of the Secretary of Health and Human Services that precluded Medicare reimbursement for a particular surgical procedure. Judicial review of "any claim arising under" the Medicare Act is available only after a claimant undergoes the procedure, seeks payment and exhausts administrative remedies. Ringer, who wished to undergo the procedure but said he could not do so without assurance of repayment, argued that he did not yet have a "claim" and so the exhaustion requirement did not apply to him. The Supreme Court rejected Ringer's arguments, holding that he was "clearly seeking to establish a right to future payments should he ultimately decide to proceed" with the surgery, and that his lawsuit was therefore a "claim arising under" the Medicare Act within the meaning of the jurisdiction-preclusion provision. 466 U.S. at 621, 104 S.Ct. at 2024. The majority contends that IRCA, like Medicare, provides only one defined channel for judicial review—in this case, a legalization application—and that all other fronts of attack on agency policy are prohibited. If Ringer's challenge was a "claim arising under" the Medicare Act, the majority believes, then the present action seeks "judicial review of a determination respecting an application" for legalization.

*Ringer* of course presents a very different fact situation and arises under a very different statute than IRCA. The Court held that Ringer's cause of action—namely, that the Secretary's ruling barring reimbursement for a certain medical procedure was invalid under the Medicare Act—con-

stituted a "claim arising under" the Act and must be pursued as such. *Ringer* cannot, however, be stretched out of its own shape to say that the claim here—that the INS' eligibility rules are invalid under IRCA—is an action seeking "judicial review of a determination respecting an application" for legalization. Unlike the Medicare Act, IRCA nowhere attempts to define and prescribe the method of review for all "claims arising under" the Act. Indeed, as we discussed, Congress rejected a Senate proposal that would have done just that. Congress in IRCA merely laid down a single uniform procedure for judicial review of "a determination respecting an application" for legalization. The word "application" as used in IRCA denotes the written document that is filed by the alien. IRCA said nothing at all about similarly regulating challenges to other kinds of agency actions. Far from providing a model for how IRCA should be construed, the Medicare Act illustrates that Congress knows how to draft a comprehensive jurisdiction-preclusion provision when it wants to.

The background and purposes of the two Acts, moreover, could not be more disparate. Congress, in enacting IRCA, set up a one-shot finite-period crash program to legalize undocumented aliens. It was intent on making sure those undocumented aliens would not be deterred from filing for legalization due to uncertainty about the rules; it created the QDEs for that purpose and mandated that accurate information about the program be broadly disseminated. In IRCA, aliens were encouraged to come forward on a confidential basis to obtain advice about legalization eligibility from the QDEs; only then need they decide whether to present a concrete claim for legalization. To the extent that uniformity of interpretation of eligibility requirements and prompt correction of erroneous administrative rulings can be achieved by direct judicial review of key INS regulations, Congress' aim will be enhanced, not denigrated. In the Medicare Act, by contrast, Congress had no reason to fear applicants would not file claims for reimbursement; in fact, it sought to establish a permanent scheme for the orderly processing of anticipated millions of claims every year; for that purpose, it "set up a scheme that requires the presentation of a concrete claim to the Secretary." *Ringer*, 466 U.S. at 625, 104 S.Ct. at 2027. The Medicare Act, according to the *Ringer* Court, was intent on balancing the individual hardship caused by uncertainty as to reimbursability "against the potential for overly casual or premature judicial intervention in an administrative system that processes literally millions of claims every year." *Id.* at 627, 104 S.Ct. at 2028. Congress' foci in the two Acts was very different: in IRCA to encourage applications, in Medicare to regulate their flow.

The very dissimilar circumstances of the two lawsuits illustrate this point. Here, the QDEs are seeking to redress the harm caused them in their statutory obligation to provide accurate information to aliens about legalization requirements by the government's misconceived regulations. These organizations cannot themselves file applications for adjustment of status, so their only redress is to bring an action challenging the regulations in district court. Ringer, on the other hand, was seeking an advance guarantee that his later "claim" for reimbursement for an operation would be successful. There is no parallel. The QDEs are not submitting a request for advance approval of an "application"; they are suing to stop the INS from acting in a way so as to hinder their basic purpose of disseminating accurate information about the legalization program and encouraging all eligible applicants to apply. The majority's asserted analogy to *Ringer* is inapposite. The statutory text in the two cases is different; the statutory schemes are different; the purposes of the two laws in regulating judicial review are altogether different. The majority strives mightily to squeeze its elephant into the proverbial phone booth, but ultimately it fails.

Indeed, a Supreme Court case interpreting the Medicare Act more recently than *Heckler v. Ringer* best points up the majority's strained logic in interpreting 8 U.S.C. § 1255a(f)(1). In *Bowen v. Michigan*

*Academy of Family Physicians,* 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), an organization of family physicians and several individual physicians filed suit in district court challenging a Health and Human Services Department regulation authorizing the payment of Medicare "part B" benefits in different amounts for similar physicians' services. The government argued that the district court lacked jurisdiction, contending that the Medicare Act impliedly forecloses judicial review of any action taken under part B of the Medicare program, because it fails to authorize such review while simultaneously authorizing judicial review of "any determination ... as to ... the amount of benefits under part A." 476 U.S. at 673, 106 S.Ct. at 2137 (quoting 42 U.S.C. § 1395ff(b)(1)(C) (1982 ed., Supp. II)). The government also pointed to a provision in the Act requiring private insurance carriers furnishing part B coverage to afford claimants a "fair hearing" on any claimant's challenge to "the amount of ... payments" under part B, but making no provision for judicial review of those fair hearings. 42 U.S.C. § 1395u(b)(3)(C).

The Supreme Court rejected the government's arguments, holding that the district court had jurisdiction over the plaintiffs' challenge to the reimbursement regulation. The Court reasoned that the provisions detailing how and in what forum an individual can obtain review of a determination as to the amount of benefits under parts A and B "simply [do] not speak to challenges mounted against the *method* by which such amounts are to be determined rather than the *determinations* themselves." 476 U.S. at 675, 106 S.Ct. at 2138 (emphasis in original).

> [A]n attack on the validity of a regulation is not the kind of administrative action that we described in [*United States v. Erika, Inc.,* 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982)] as an "amount determination" which decides "the amount of the Medicare payment to be made on a particular claim" and with respect to which the Act impliedly denies judicial review.

476 U.S. at 676, 106 S.Ct. at 2138–2139. The Court distinguished *Ringer* as a case seeking review of an amount determination, *id.* at 677–78 n. 7, 106 S.Ct. at 2139–2140 n. 7, and rejected the argument that its ruling would open the floodgates of litigation.

> Unlike the *determinations* of amounts of benefits, the *method* by which such amounts are determined ordinarily affects vast sums of money and thus differs qualitatively from the "quite minor matters" review of which Congress confined to hearings by carriers. In addition, as one commentator pointed out, "permitting review only [of] ... a particular statutory or administrative standard ... would not result in a costly flood of litigation, because the validity of a standard can be readily established, at times even in a single case."

*Id.* at 680–81 n. 11, 106 S.Ct. at 2140–41 n. 11 (emphasis in original) (quoting Note, 97 Harv.L.Rev. 778, 792 (1984)).

*Bowen v. Michigan Academy of Family Physicians* demolishes the majority's broad reading of the IRCA term "determination respecting an application." 8 U.S.C. § 1255a(f)(1). Application of this panel's logic to the *Michigan Academy* case would dictate a result 180 degrees opposed to that reached by the Supreme Court. The majority here argues that a regulation is a "determination respecting an application" because it impacts on the outcome of future determinations on applications. Maj. op., *ante,* at 1331. That same logic would have required the Supreme Court to deem the HHS regulation in *Michigan Academy* to be an "amount determination" because it would surely have impact on future amount determinations; the Supreme Court, however, refused to do so.

*Michigan Academy* also shows the limited applicability of the *Heckler v. Ringer* holding, on which the majority relies. After *Michigan Academy,* the proposition *Ringer* stands for is, at the most, that *individual Medicare claimants* must follow the narrow statutory path of limited administrative and judicial review rather than challenge regulations in federal dis-

trict court. *Michigan Academy* found that the narrow review provisions simply do not apply to an organization of physicians bringing a facial challenge in district court. A similar logic should prevail in this case: just as the *Michigan Academy* organization was not challenging an "amount determination," the organizations bringing this lawsuit are not seeking review of "a determination respecting an application." Thus, even if the logic of *Ringer* were to dictate that individual aliens could not bring an action in district court directly challenging the INS regulations challenged in the present case—a proposition in itself dubious [9]—*Michigan Academy* makes clear beyond peradventure that *Ringer's* logic is no bar to a challenge brought by alien-assistance organizations who (like the physicians in *Michigan Academy*) will never have claims capable of being processed through the standard statutory review procedure.

Finally, *Michigan Academy* adopts a pragmatic interpretation of a narrow statutory judicial review scheme by focusing—in a way this panel has failed to—on Congress' purpose for limiting judicial review. The *Michigan Academy* Court recognized a distinction between challenges to agency determinations on individual applications, on the one hand, and challenges to the validity of a regulation establishing the method by which such determinations will be made, on the other. In the present case, just as in *Michigan Academy*, permitting direct judicial review of a regulation "would not result in a costly flood of litigation, because the validity of a standard can be readily established, at times even in a single case." 476 U.S. at 680–81 n. 11, 106 S.Ct. at 2140–41 n. 11.[10] The majority's quest for Supreme Court support for its reading of 8 U.S.C. § 1255a(f)(1) is doomed:

*Michigan Academy* has knocked its *Ringer* out of the box.

### III. RIPENESS

Alternatively, the majority rules that the INS policy on § 265 cases was not yet finalized so as to be ripe for review; because it still reflected only the decisions of lower level agency officials and had not yet been approved or adopted at the top policy-making level, it was not an "agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(13), not "final" within the meaning of the APA, *id.* § 704, and not "ripe" for purposes of the familiar test enunciated in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). I disagree.

My colleagues begin their analysis by pointing out that the INS "acquiesced in the district court's interpretation" of 8 U.S.C. § 1255a(a)(2)(B)—which the majority paraphrases as holding "that 'known to the Government' meant that a nonimmigrant qualified for legalization if he could show that the federal government as a whole had documentation that established his illegal status before 1982." Maj. op., *ante*, at 1341 (quoting 8 U.S.C. § 1255a(a)(2)(B)). But—they say—after acquiescing in the court's interpretation, the INS never focused on what to do about § 265 cases, in which the government's knowledge of the alien's unlawful status must derive from the *absence* of a required document, rather than the presence of a document, in the alien's files. Evidence that some INS field personnel took the position that § 265 violators were not eligible for legalization even after the INS' acquiescence in the district court's interpretation of 8 U.S.C. § 1255a(a)(2)(B) is not sufficient to show

---

9. As discussed above, the *Ringer* preclusion of rule challenges brought by individual Medicare claimants cannot be readily transplanted into IRCA, whose jurisdiction-preclusion provision does not bar all "claims arising under" IRCA but instead bars all suits seeking review of "a determination respecting an application." *See supra* p. 1359.

10. The majority states: "It seems inconceivable that Congress would have wished ... to closely circumscribe judicial review of legalization decisions that applied whatever regulations the INS issued, and at the same time to allow APA challenges to such regulations in almost any district court of the United States." Maj. op., *ante*, at 1333. *Michigan Academy*, however, shows that Congress sometimes *does* intend to circumscribe (or foreclose) judicial review of case-by-case application of rules while permitting district court challenges to the rules themselves.

any final agency action on the issue. In their view, only a rule, policy statement, or perhaps official litigation position in a deportation proceeding would make a challenge ripe.

My reading of the record in the trial court convinces me that the INS was implementing an official policy of refusing legalization to § 265 violators even after it had acquiesced in the trial judge's "known to the Government" ruling, and so the § 265 challenge was ripe for review. I find that such a policy was embodied in an agency regulation, 8 C.F.R. § 245a.1(d).[11] Judge

Sporkin's March 30, 1988, decision invalidated that regulation not only because it defined "Government" too narrowly as limited to the INS, but also because it contained an overly restrictive definition of the sort of information the INS must have in its own files to constitute "know[ledge]" under the "known to the Government" provision of IRCA.[12] The logic and language of Judge Sporkin's March 30 and April 6 rulings compelled the INS to drop its regulation-based policy against legalizing § 265 aliens,[13] yet at least some INS officials persisted in interpreting his order otherwise.[14] As a result, the plaintiffs sought

---

11. The regulation provided for four circumstances in which an alien's unlawful status would be considered to have been *"known* to the Government." None of the four can possibly be read to include § 265 violators. The four categories are as follows:

(1) The [INS] received factual information constituting a violation of the alien's nonimmigrant status from any agency, bureau or department, or subdivision thereof, of the Federal government, and such information was stored or otherwise recorded in the official Service alien file.... In order to meet the standard of "information constituting a violation of the alien's nonimmigrant status," the alien must have made a clear statement or declaration to the other federal agency, bureau or department that he or she was in violation of nonimmigrant status; or

(2) An affirmative determination was made by the Service prior to January 1, 1982, that the alien was subject to deportation proceedings....; or

(3) A copy of a response by the Service to any other agency which advised that a particular alien had no legal status in the United States or for whom no record could be found[; or]

(4) The applicant produces documentation from a school approved to enroll foreign students ... which establishes that the said school forwarded to the Service a report that clearly indicated the applicant had violated his or her nonimmigrant status prior to January 1, 1982.

8 C.F.R. § 245a.1(d).

12. Wholly apart from its discussion of the INS' interpretation of "Government," Judge Sporkin's March 30 order criticized the regulation's provisions concerning what must be contained in INS files. *See Ayuda v. Meese,* 687 F.Supp. 650, 664–65 (D.D.C.1988) (opining that those aspects of the regulation "are narrow and operate in practice to prevent some valid claims," and elaborating on how unlikely it would be for an alien to meet the INS' definition of "known").

13. Judge Sporkin's order stated without qualification: "I declare INS' regulation to be contrary to law," and, again without qualification, it enjoined the INS from "any further application of the regulation." 687 F.Supp. at 666. The order was based not only on the regulation's narrow definition of "Government" but also on its narrow definition of "know[ledge]." *Id.* at 664. Thus, the court invalidated in its entirety the regulation on which the INS's policy concerning § 265 aliens was based.

Judge Sporkin's Supplemental Order of April 6 further clarified that the regulation's invalidity stemmed in part from its narrow definition of "known." *Id.* at 666–67. That order stated that an alien's unlawful status was "known to the Government" if that alien's documentation in one or more government agencies, "taken as a whole would warrant the finding that the nonimmigrant alien's status in the United States was unlawful." *Id.* at 666.

14. Affidavits submitted by the plaintiffs reported instances of front-line INS personnel telling § 265 aliens that their applications would be recommended for denial. Moreover, a wire sent by the Associate Commissioner of the INS to all QDEs on April 13, 1988, paraphrased the district court's ruling in such a way as to foreclose legalization of § 265 aliens. After quoting the language of Judge Sporkin's April 6 order, the wire stated: "[T]he violation must be able to be induced from evidence *submitted* to Federal agencies only, and prior to January 1, 1982." Appendix ("App.") at 88 (emphasis added). Thus, while the court's order referred to "documentation taken as a whole," 687 F.Supp. at 666, which would encompass the *absence* of documents *never submitted,* a top official of the INS interpreted the order not to encompass § 265 aliens.

Additionally, counsel for the INS voiced the same interpretation of the March 30 and April 6 orders before the district court. Transcript of Status Call, April 28, 1988, at 20 (plaintiffs' arguments concerning § 265 violators do not "comport with the Court's order *that there be*

and received from Judge Sporkin a subsequent court order (Supplemental Order V) clarifying that § 265 aliens were covered by the logic of his earlier ruling and that the INS must act accordingly.[15]

These circumstances, along with the extreme urgency of the plaintiffs' plight (aliens had literally two days left to file applications at the time of the ruling), severely undercut the majority's ripeness arguments. Their insistence that the cited actions of scattered INS officials discouraging § 265 violators from filing in the weeks following the March 30 ruling did not constitute final agency action is beside the point: it was the original regulation, 8 C.F.R. § 245a.1(d), not the scattershot application of it after March 30, that constituted final agency action. Supplemental Order V, clarifying the application of the earlier order to § 265 violators, simply reiterated that the entire regulation had been struck down—not merely that aspect of it which defined "Government" solely as the INS, but also the portion defining what kind of information constituted "know[ledge]." When Judge Sporkin became aware that the INS was continuing to follow the policy embodied in a regulation he had already struck down, and that the INS was doing so in reliance on a misconstruction of his prior rulings, he was warranted in issuing a new order clarifying what his other rulings had already stated: that 8 C.F.R. § 245a.1(d) was invalid both in its interpretation of "Government" and in its interpretation of "known."

The majority contends that (even assuming the original 8 C.F.R. § 254a.1(d) did exclude § 265 aliens) the appellees' original complaint in district court contained no

"concrete" legal claim against the regulation's interpretation of the statutory term "known." Maj. op., *ante*, at 1342 ("Their only specific argument, so far as we can tell, was that 'Government' must mean the entire federal Government and not merely the INS."). This is fallacious. The complaint challenged the INS' definition of "Government" and then went on to allege that "[t]he regulations *further* restrict the statutory provision by specifically enumerating the limited circumstances under which the INS is deemed to *know* of an alien's unlawful status." Complaint, App. 35 (emphasis added). Quite plainly, the complaint asserted that even assuming the INS must know of the alien's unlawful status, the regulation defined "known" in an impermissibly narrow fashion. The complaint's prayer for relief, moreover, requested the establishment of a broad evidentiary standard: an alien would meet the test whenever any federal agency "has or had evidence that, separately or in combination, shows that such alien had violated his or her nonimmigrant status prior to January 1, 1982." Complaint, App. 39. Clearly, the plaintiffs sought the invalidation of 8 C.F.R. § 245a.1(d) as a whole, not just as it defined "Government." For the majority to assert that "[t]he focus of the proceeding" was on the one issue rather than the other is not only a weak retort to the reality of the record; it is wrong: the complaint advanced a theory that included § 265s, the district court's opinion adopted it; this court cannot post-hoc wish it out of existence.

The majority argues, however, that even if the plaintiffs had initially challenged 8 C.F.R. § 245a.1(d) on the basis of its interpretation of "known," the INS had not yet

---

*documents in the file* in a Government file showing unlawful residence") (emphasis added).

**15.** The plaintiffs (who adopted the arguments advanced by several other organizations that tried without success to intervene in the present case) styled their arguments as contending that the March 30 and April 6 orders by their terms and logic already reached the § 265 issue and resolved it in their favor; they therefore sought enforcement and clarification if necessary. Memorandum of Points and Authorities in Support of Intervenors' Motion to Compel Compliance and/or Modify Permanent Injunction,

Supplemental Appendix ("Supp.App.") at 12 & n. 5 ("Now that the INS policy has been judicially rejected ... there is no valid remaining reason for the agency's denials."). The putative intervenors and the plaintiffs sought an order compelling the INS to comply with the district court's other rulings, *id.* at 7, 16 n. 8, or, in the alternative, an order modifying the earlier rulings to indicate that § 265 aliens were eligible for legalization. *Id.* at 16 n. 8. Judge Sporkin's Supplemental Order V essentially did the latter. 687 F.Supp. at 668–69.

taken a position on the § 265 issue. Maj. op., *ante*, at 1342–1345. This is contradicted by the plain terms of 8 C.F.R. § 245a.1(d) itself. *See supra* note 11. The regulation on its face excludes § 265 violators from the legalization program. Given the clarity of the regulation, it cannot be argued that the issue here is not yet fit for judicial decision. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149–52, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967) (preenforcement review available where "[t]he regulations are clear-cut," presenting a "purely legal" issue, and constitute the agency's formal and definitive statement of policy); *Eagle–Picher Industries v. EPA*, 759 F.2d 905, 917–18 & n. 68 (D.C.Cir.1985) ("the validity of a rule can be ripe for review whether or not it has actually been improperly applied and enforced in a concrete factual setting"). In short, the majority's ripeness arguments ignore the fact that the INS had a formal, final policy on § 265 violators and at least some of its officers continued to pursue that policy after misconstruing the district court's ruling striking down the challenged INS regulation. Only a fundamental misreading of the procedural history of the case can sustain a finding that the § 265 issue was not ripe for judicial review.

## IV. THE STANDING OF THE PLAINTIFF ORGANIZATIONS

Although the majority does not base its negative outcome on standing grounds, it does intimate that the plaintiffs' standing in this case is doubtful. Since I find no statutory bar to jurisdiction, and since the government raised the standing issue, I must discuss it briefly.

A plaintiff challenging agency action in federal court must, in order to meet the Article III test of standing, demonstrate (1) some actual or threatened injury that (2) fairly can be traced to the challenged action and (3) is likely to be redressed by a favorable decision. *National Wildlife Federation v. Hodel*, 839 F.2d 694, 704 (D.C.Cir.1988). Additionally, there is the prudential requirement that the asserted injury be "arguably within the zone of interests protected or regulated by the law on which the complaint is founded." *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 936 (D.C.Cir.1986).

These plaintiff organizations did allege a concrete injury to their organizational activities, caused by the INS' promulgation of 8 C.F.R. § 245a.1(d), and redressable by the court's invalidation of that regulation. Their allegations fall into three broad categories: (1) that their ability to provide accurate information concerning legalization eligibility requirements has been impaired by the legal confusion generated by the INS' alleged misconstruction of IRCA, Complaint, App. 20; (2) that their fundamental organizational purpose of assisting aliens to avail themselves of the benefits of legalization has been directly harmed by the INS' regulations because those regulations have deterred the organizations' clients from filing applications, Complaint, App. 21–23;[16] and (3) that they have had to devote significant resources to counteract the effects of the INS' allegedly unlawful interpretation. Complaint, App. 20, 23. These allegations—especially the latter two—are indistinguishable from the allegations held to be sufficient to convey standing on the plaintiff organizations in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). There, it was sufficient that the plaintiff organization, whose purpose was to help minorities buy available housing, was frustrated in that purpose by illegal "racial steering" practices and consequently had

---

**16.** The original complaint stated that one organization's potential clients had been "deterred from filing" because of the INS' interpretation of IRCA. App. 21. The complaint stated that the organization's "extensive counseling campaign to assist Ethiopians and other nationalities to avail themselves of the benefits of legalization under IRCA, which is one of its fundamental organizational purposes, has thus been significantly and directly harmed and frustrated by the INS' invalid regulations." App. 21–22. *See also* App. 23 (another organizational plaintiff's "fundamental goals and purposes of assisting Latino youth to obtain the benefits of legalization under IRCA have thus been significantly and directly harmed and frustrated by the INS' misconstruction of the 'known to the Government' requirement").

to devote significant resources to counteract the effects of those practices. *Id.* at 378–79, 102 S.Ct. at 1124. This case is, in all material respects, identical to *Havens Realty.*

The interests at stake in this case also satisfy the prudential "zone of interests" requirement. The complaint alleged that 8 C.F.R. § 245a.1(d) made it more difficult for aliens eligible for legalization under IRCA to exercise their statutory right to obtain legalization, and that the organizations' interest in helping the aliens obtain legalization was thereby injured. App. 21–22. Congress clearly had in mind the interests of alien-assistance organizations, like the plaintiffs here, when it designed and adopted IRCA. *See Action Alliance,* 789 F.2d at 939–40 n. 11. Congress not only recognized but indeed institutionalized in the Act itself those organizations' ability to render accurate legal advice about legalization requirements. Given Congress' express recognition of the key role played by alien-assistance organizations, the organizations' own interests fall squarely within the zone of interests protected by IRCA. *Action Alliance* held, as a general matter, that such organizational interests as "promotion of the knowledge, enjoyment, and protection of the rights created by a statute are securely within the 'zone of interests' protected by that statute." *Action Alliance,* 789 F.2d at 939. The interests of the organizational plaintiffs in this case fall precisely into such a category and meet the prudential as well as the Article III requirements for standing.

## V. THE MERITS OF THE § 265 QUESTION

Finding no bar to the district court's exercise of jurisdiction over this case, I reach—at last—the merits of the dispute. The order challenged in the present appeal held that an alien's unlawful status was "known to the Government" within the meaning of 8 U.S.C. § 1255a(a)(2)(B) if that alien can credibly establish his or her "willful violation of section 265" of the INA,

*i.e.,* his or her unexcused failure to file the quarterly reports required by § 265. 687 F.Supp. at 668. The district court held that the absence of a required document in a government file confers "know[ledge]" on the government.

Under § 265 of the INA, prior to January 1, 1982, a nonimmigrant alien was required to file a document stating his current address every three months, so long as he remained in the United States, regardless of whether his address changed. 8 U.S.C. § 1305 (amended as of Dec. 29, 1981, Pub.L. No. 97–116, § 11, 95 Stat. 1617). Failure to file such quarterly reports while living in the United States rendered a nonimmigrant's status unlawful. Moreover, an alien had to notify the Attorney General within ten days of "each change of address and new address," *id.,* if he departed the United States to live in another country. Thus, the alien's INS file would have to contain either a quarterly report for each three-month period or a change-of-address report indicating that the alien had left the United States and therefore was exempt from the quarterly report requirement. Consequently, as of January 1, 1982, the INS was able to determine from a nonimmigrant's INS file, by the *absence* of quarterly reports, whether the alien was in violation of § 265.

When Congress used the term "the alien's unlawful status was known to the Government" in 8 U.S.C. § 1255a(a)(2)(B), it obviously contemplated that the INS would be deemed to "know[ ]" of an alien's unlawful status where an examination of the alien's file would turn up a document that in itself indicates that the alien's status is unlawful.[17] There is no defensible difference between that circumstance and this one: an examination of the alien's INS file would turn up the *absence* of a required document, which absence by itself indicates that the alien's status is unlawful. In both cases the agency has *actual knowledge* from its files of the alien's illegal status. Since perusal of the files produces actual

---

**17.** Even the INS recognized this in 8 C.F.R. § 245a.1(d)(4), which considers an alien's unlawful status to be known if a school had sent the INS "a report that clearly indicated the appellant had violated his or her nonimmigrant status" before January 1, 1982.

knowledge of illegality, the majority's point about the various possible definitions of the word "known" is irrelevant. Maj. op., *ante*, at 1344.[18] Thus, the district court's conclusion that the term "known" unambiguously embraces the circumstance where the absence of a document itself indicates unlawful status seems unimpeachable. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (where congressional intent is clear, court and agency "must give effect to the unambiguously expressed intent of Congress").

Moreover, contrary to the majority's contention, a § 265 violator's unlawful status could be determined simply by noting the absence of required documents in his file. The majority argues that the INS could not have known, merely by looking at an alien's file, that the alien's failure to file was "willful" and thus rendered the alien's status unlawful. Maj. op., *ante*, at 1344. Yet, to begin with, the failure to file a § 265 report was defined in the INA to be a misdemeanor—completely without regard to willfulness. 8 U.S.C. § 1306(b). Moreover, the INA provided that any alien who violated the § 265 filing requirement was to be arrested and deported "unless such alien established to the satisfaction of the Attorney General that such failure was reasonably excusable or was not willful." *Id.* § 1306(b). Thus, willfulness was not an element of a § 265 violation; instead, an alien threatened with deportation could invoke nonwillfulness as an affirmative defense that the alien would have the burden of establishing. An INS official looking at an alien's file prior to 1982 would know

solely from the absence of one or more required § 265 forms that the alien's status was *prima facie* unlawful. Since that official would have known everything needed to bring a deportation proceeding against the nonfiling alien, the alien's unlawful status was "known to the Government." I agree with the district court that the treatment of § 265 violators in 8 C.F.R. § 245a.1(d) was contrary to law.[19]

## VI. CONCLUSION

In my view, the district court had jurisdiction to rule on the eligibility of § 265 violators for legalization. Neither IRCA's judicial review provisions, nor ripeness or standing doctrine precluded the district court's exercise of federal-question jurisdiction under 28 U.S.C. § 1331 and 8 U.S.C. § 1329 to invalidate INS legalization rules. With one minor exception, I would affirm Supplemental Order V.

Congress meant by the legalization program to extend a generous hand to long-time resident illegal aliens previously consigned to living in the shadows. Under IRCA's amnesty dictates, the aliens had to act quickly to apply for legalization in order to meet prescribed deadlines; the QDEs were established to aid them in their quest for legalization. It flouts the text and purpose of this statutory design to interpret § 1255a(f), as my colleagues do, to prevent any prompt judicial testing of INS rules that wrongfully bar legalization to large categories of those aliens, and to relegate those aliens to individual challenges in the course of deportation proceedings. So interpreted, the legalization program is a cruel joke for a compassionate

---

**18.** The majority contends that, while the presence of a document in INS files would convey actual knowledge, the "mere absence of a quarterly report may well not lead to actual knowledge if all files are not monitored closely." Maj. op. at 1345. I fail to see how this distinguishes an "absence" case from a "presence" case. If an agency's files are not monitored closely, then agency officials will be equally ignorant of what the files do contain and what they do not contain.

**19.** As discussed in the text, however, I do not read § 265 as requiring any showing of willful-

ness on the part of the government to make out a *prima facie* violation. Hence, the absence of the reports would be sufficient to make a violation "known" to the government. Conversely, the alien wishing to show a past violation would only have to point to the absence of the same reports. The government's earlier failure to prosecute the violation and thereby afford the alien an opportunity to plead a nonwillfulness defense cannot result in a heavier burden on the alien to prove a violation now than the government itself would have had then. This is the one respect in which I would modify Judge Sporkin's order.

nation to play on those it purports to welcome and redeem. I cannot believe Congress intended such a result, and so I respectfully dissent.

